196 P.3d 184 (2008)
2008 WY 134
CITY OF GILLETTE, Wyoming, Appellant (Defendant),
v.
HLADKY CONSTRUCTION, INC., Appellee (Plaintiff).
Nos. S-07-0291 to S-07-0293.
Supreme Court of Wyoming.
November 14, 2008.
*189 Representing Appellant: Raymond B. Hunkins and Amanda Hunkins Newton of Jones, Vines & Hunkins, Wheatland, Wyoming.
Representing Appellee: Patrick Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming; Tad T. Daly of Daly Law Associates, P.C., Gillette, Wyoming.
*190 Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
KITE, Justice.
[ś 1] A jury awarded Hladky Construction, Inc. (HCI) damages in the amount of $1,125,436.77 against the City of Gillette (City) for breach of the implied covenant of good faith and fair dealing. The district court entered judgment on the verdict and, subsequently, awarded HCI attorney fees and costs pursuant to the parties' contract.
[ś 2] In its first appeal, the City claims HCI did not comply with the Wyoming Governmental Claims Act in presenting its notice of claim and, therefore, the district court lacked subject matter jurisdiction to consider its claims. Alternatively, the City claims the district court erred in several respects in not granting its motions for judgment as a matter of law and in failing to adequately instruct the jury. In its second and third appeals, the City claims the district court erred in awarding attorney fees. We find no reversible error and affirm.

STATEMENT OF THE ISSUES
[ś 3] In its first appeal, the City presents the following issues:
A. Where it is established in a breach of construction contract suit that the City of Gillette, the owner, neither did anything forbidden by the contract nor failed to do something required by the contract, may Hladky Construction, Inc., the contractor, still recover for breach of an implied covenant of that contact?
B. Where the City of Gillette did not breach its contract with Hladky Construction, Inc., could delay and breach of contract, "total cost" damages be awarded for breach of an implied covenant, where the contract provided for an exclusive remedy of time extension and where Hladky Construction, Inc. failed to prove the predicate for using the total cost method.
C. Where Hladky Construction, Inc. asked for and received a change order, without reservation of rights, and accepted $71,133.00 in extra compensation for changing from its problematic supplier, is Hladky Construction, Inc. allowed to accept the change order, take the money, change suppliers and then later bring suit and be awarded additional damages allegedly caused by choosing the wrong supplier?
D. Must the trial court enforce contract procedures for asserting a claim which are conditions of bringing suit, and if it fails to do so must it at least instruct on them and allow relevant evidence bearing on the conditions to be admitted?
E. Did the trial court (and does this court) have subject matter jurisdiction?
[ś 4] HCI rephrases the issues as follows:
A. Has Wyoming already held that a party can breach its implied covenant of good faith and fair dealing without breaching the express terms of its contract?
B. Did the trial evidence support the jury's verdict that the City of Gillette breached its implied covenant of good faith and fair dealing?
C. Where the contract does not contain a "no damages for delay" clause, is the contractor entitled to recover delay damages?
D. Did the district court correctly instruct the jury on proper damage calculation methods when multiple calculation methods were presented at trial?
E. Did the trial evidence support the jury's verdict that HCI complied with all the contractual conditions precedent to pursuing its claim for delay damages?
F. Did the trial court correctly conclude that the City of Gillette failed to prove that change order No. 2 was an accord and satisfaction, or waiver, of HCI's claim for delay damages?
G. Did the district court properly exercise its discretion when it precluded the City from presenting evidence of HCI's conduct on two prior and unrelated claims?
H. Did HCI's governmental claim contain sufficient information to vest the district court with subject matter jurisdiction?
[ś 5] In its second and third appeals, the City presents the following issues:
A. Where a contractual provision allows for reasonable attorneys' fees, and *191 costs of suit to be awarded to the prevailing party in a suit to enforce rights under the Contract Documents, does a finding that the party against whom suit was filed was not in breach of the contract, preclude the award of those attorneys' fees to the plaintiff?
B. Where Hladky Construction, Inc. disclaimed the Contract's provisions at the trial of this matter, can it simultaneously seek the benefits of the Contract's fee-shifting provision allowing reasonable attorneys' fees, and costs of suit?
C. Whether Hladky Construction, Inc. brought two claims against the City of Gillette, failing on one claim, and succeeding on the other claim, is it required, as a matter of law, to segregate its fees between its successful and unsuccessful claims, and does its failure to segregate its fees preclude the award?
D. Whether the District Court abused its discretion by: (1) allowing Hladky Construction, Inc. to increase the hourly rate for its attorney once the Jury's decision became known; (2) awarding substantial attorneys' fees to Hladky Construction, Inc. for dispositive motions that were untimely, and not heard by the Court; and (3) awarding Hladky Construction, Inc. its electronic research charges?
E. Did the District Court (and does this Court) have subject matter jurisdiction?
HCI re-states substantially the same issues.

FACTS
[ś 6] In 2000, the City embarked on a project to remodel and expand City Hall. The City hired Schutz Foss Architects, P.C., (Schutz Foss) as the project architect. Schutz Foss assigned its employee, Kyle Gillette, to act as project manager on site during construction. HCI, a Gillette construction company owned and operated by Mike and Judy Hladky, was one of four companies that submitted a bid for the project.
[ś 7] The project specifications required precast concrete exterior panels to be installed on the new part of the building to match the panels on the existing structure. The specifications provided: "[T]he precast concrete manufacturing plant shall be certified by the Precast/Prestressed Concrete Institute, Plant Certification Program, prior to the start of production." Bill Oakey, a structural engineer retained by Schutz Foss for the City Hall project, added the italicized language to what was otherwise a standard American Institute of Architects (AIA) provision after learning that only one certified precast concrete manufacturing plant, Gage Brothers Concrete Productions, Inc. (Gage Brothers), planned to bid on the project. In order to promote competitive bidding and keep Gage Brothers from artificially inflating its bid, Mr. Oakey added the italicized language so that other uncertified manufacturing plants could bid and be considered for the project and become certified later, before beginning production of the precast panels.
[ś 8] In the bid it initially prepared for submission to the City, HCI identified Gage Brothers as its precast panel manufacturer. On the day the City accepted bids, however, HCI received a quote from Architectural Sales Products (ASP) indicating that Winfrey Architectural Concrete, Inc. (Winfrey) could produce the panels at a price $67,585 lower than Gage Brothers' quote. HCI changed its bid to name Winfrey as its precast manufacturer. At the time it submitted its bid, HCI believed Winfrey was a certified precast manufacturer.[1]
[ś 9] Mr. Gillette reviewed HCI's bid as well as those submitted by three other construction companies. Mr. Oakey also reviewed the bids, checked around and learned that Winfrey was not a certified architectural precast panel manufacturer and had been in the process of trying to obtain certification for eighteen months. He shared this information with Mr. Gillette, but neither he nor Mr. Gillette shared it with HCI. Despite knowing that Winfrey did not have the necessary certification and a contract provision *192 requiring the architect to notify bidders of any objections to a bid,[2] no City representative objected to HCI's use of Winfrey as its precast manufacturer and, on August 24, 2000, the City awarded the contract to HCI. HCI learned that Winfrey did not have the required certification sometime between submitting its bid on August 8, 2000, and signing the contract on August 24, 2000.
[ś 10] On August 31, 2000, one week after signing the contract, the parties attended a project meeting. At the meeting, Mr. Gillette informed HCI that the City and the architect needed Winfrey's certification before HCI ordered the precast panels. This was contrary to the project specification that required the manufacturer to have its certification prior to the start of production of the panels. Mr. Gillette's statement concerned Mr. Hladky because in order to complete phase 1 of the project on schedule, HCI needed to place the order for the precast panels very soon and not wait until Winfrey was certified.
[ś 11] Immediately after the project meeting, HCI sent a letter advising Winfrey that it could not order the precast panels until Winfrey was certified. Mr. Hladky testified that he also met with Mr. Gillette and Dan Roberts, the assistant city engineer, and neither of them would retract Mr. Gillette's statement that certification was required before the precasts could be ordered. Mr. Hladky also testified that on September 18, 2000, HCI submitted a request for a change order to allow it to substitute Gage Brothers for Winfrey as its precast supplier at an additional cost of $83,249.23. Mr. Gillette did not respond to the request.
[ś 12] On October 5, 2000, Mr. Hladky met with city administrator John Darrington, Mr. Roberts and Mr. Gillette in the hope of getting the change order request approved. Mr. Darrington told Mr. Hladky that he did not have authorization to approve the request and that HCI should focus on getting Winfrey certified. HCI submitted a second change order request at the end of October proposing to deduct the price of the precast panels from its bid and have the City negotiate with certified suppliers for production of the panels "in an effort to minimize the cost of delays, litigation, etc." In the letter, HCI stated: "Due to the ambiguous specifications there is potential for a major impact on the schedule causing loss of productivity and increased costs." Mr. Gillette denied the request.
[ś 13] HCI followed up with another letter dated October 31, 2000, reiterating that the delay caused by the City's action and inactions had resulted in additional costs. HCI advised the City that it would monitor and document the costs as the job progressed. Two weeks later, the city council approved a change order to allow HCI to substitute Gage Brothers as its precast supplier. By this time, however, Gage Brothers was busy on other projects and could not begin work on the precast panels for several weeks. HCI sent another letter dated November 28, 2000, stating in pertinent part:
Pursuant to our conversations the last few days we will reschedule the subs as necessary to complete the project as efficiently as possible. With the owner caused delays and the winter months upon us the concrete imbed[3] delays have caused an extension *193 of time for the foundation which will change the rest of the schedule. We will document those costs for the owner[']s account.
Although Mr. Gillette did not sign the change order approved by the city council until the end of January 2001, HCI proceeded with Gage Brothers as the precast panel manufacturer. Winter weather and subcontractor schedules further delayed the completion date and increased the project cost. HCI completed the project originally scheduled for completion in August of 2001 one year later, in August of 2002.
[ś 14] In March of 2003, HCI submitted a claim to the City for $1,300,016.57 in damages allegedly caused by the specification change and subsequent delays. In accordance with the contract, the City and HCI attempted unsuccessfully to mediate the claim on three separate days.[4] HCI then served the City with a notice of claim pursuant to Wyo. Stat. Ann. § 1-39-101 (Lexis-Nexis 2007) and Art. 16, § 7 of the Wyoming Constitution. When the City did not respond, HCI filed a complaint in district court claiming that the City breached the contract and the implied covenant of good faith and fair dealing when it refused to allow HCI to order the precast panels from Winfrey until it obtained the required certification contrary to the express contract provision requiring certification prior to the start of production. HCI also claimed the City breached the contract and the implied covenant when it failed to approve HCI's change order requests in time for HCI to order the precast panels from Gage Brothers and prevent further delay. The City answered the complaint and filed a counterclaim against HCI for breach of the implied covenant of good faith and fair dealing and failure to abide by the claims and dispute provisions of the contract.
[ś 15] Prior to trial the parties submitted proposed jury instructions to the district court. HCI included instructions concerning the cardinal change doctrine informing the jury that a cardinal change is a change in the contract so profound that it cannot be redressed under the contract, constitutes a material change of the contract and relieves the other party from its duty to perform under the contract. The City submitted instructions as well, including a damage instruction setting out the elements required for use of the total cost method of calculating damages.
[ś 16] On May 29, 2007, the district court convened a jury trial. At the conclusion of HCI's case in chief, the City moved pursuant to W.R.C.P. 50 for judgment as a matter of law on all of HCI's claims. The district court granted the motion with respect to the cardinal change claim[5] but denied it on the breach of contract and breach of the implied covenant claims. The City proceeded with its defense and, after HCI presented its rebuttal witnesses, renewed its motion for judgment as a matter of law. The district court again denied the motion.
[ś 17] After a five week trial, the jury returned a verdict finding that the City had not breached the contract but had breached the implied covenant of good faith and fair dealing. On the City's counterclaim, the jury found that HCI did not breach the implied covenant of good faith and fair dealing. The jury awarded HCI damages in the amount of $1,125,436.77. The district court entered judgment on the verdict. The City renewed its Rule 50(b) motion for judgment as a matter of law and moved alternatively for a new trial pursuant to Rule 59. The district court denied the motions and awarded HCI attorney fees pursuant to the parties' contract. The City filed timely notices of appeal challenging both the judgment and two orders awarding attorney fees.

DISCUSSION

1. Sufficiency of the Notice of Claim
[ś 18] The City claims the district court lacked, and this Court lacks, subject *194 matter jurisdiction to consider HCI's claims because its notice of claim did not comply with Wyo. Stat. Ann. § 1-39-113 (LexisNexis 2007). Specifically, the City asserts the notice of claim did not describe the conduct constituting, or the damages resulting from, the alleged breach of the implied covenant of good faith and fair dealing. When a claimant fails to comply with § 1-39-113, a district court has no jurisdiction to consider claims brought against a governmental entity. Peterson v. Sweetwater County School District No. 1, 929 P.2d 525, 529 (Wyo.1996). Because neither the district court nor this Court would have authority to decide the matters presented if the City is correct that HCI did not comply with § 1-39-113, we address the notice of claim issue first.
[ś 19] On March 12, 2004, approximately one and a half years after substantial completion of the City Hall project and five months after the parties' unsuccessful attempts to mediate their dispute came to an end, HCI served the City with a notice of claim for $1,300,015.97. The notice itself was 4 1/2 pages in length and referenced 11 attachments, including a "Summary of financial impact to HCI." Mr. Hladky verified under oath that he had read the notice and that its contents were true and correct.
[ś 20] Three months later, on June 7, 2004, HCI served the City with an amended governmental claim. The amended notice was identical to the earlier one except that Mr. Hladky verified "under penalty of perjury" that the notice was correct as required by the Wyoming Constitution, Art. 16, § 7.[6] The City did not respond to the notices of claim and, on December 1, 2004, HCI filed its complaint against the City for breach of contract and breach of the implied covenant of good faith and fair dealing. In its answer, the City asserted among its affirmative defenses that HCI's notice of claim did not comply with the Wyoming Governmental Claims Act notice provision.
[ś 21] On July 10, 2007, after the jury returned its verdict on June 27, 2007, the City filed an objection to the proposed judgment asserting that the district court lacked subject matter jurisdiction over the case because HCI's notice of claim did not comply with Art. 16, § 7 and § 1-39-113. HCI responded, claiming as it does now that its notice of claim was sufficient. The district court considered the arguments and rejected the City's contention, concluding that both the breach of contract claim and the breach of the implied covenant claim were mentioned in the notice of claim, the conduct and damages were similar for both claims and the notice of claim was not defective.
[ś 22] The City does not assert that HCI failed to serve a notice of claim and an amended notice of claim. The City also does not assert that service of the notice of claim was untimely or that it was not properly signed and certified. The City's only claim is that the notice did not adequately notify it as to the conduct giving rise to the claim for breach of the implied covenant and the damages allegedly resulting from the breach. Citing Hochalter v. City of Gillette, 2005 WY 125, 120 P.3d 674 (Wyo.2005), the City contends the notice was insufficient because it only "generically-described" the conduct giving rise to HCI's claims.
[ś 23] Section 1-39-113 provides in pertinent part:
(a) No action shall be brought under this act against a governmental entity unless the claim upon which the action is based is presented to the entity as an itemized statement in writing within two (2) years of the date of the alleged act, error or omission....
(b) The claim shall state:
(i) The time, place and circumstances of the alleged loss or injury including the name of the public employee involved, if known;

*195 (ii) The name, address and residence of the claimant and his representative or attorney, if any; and
(iii) The amount of compensation or other relief demanded.
Pursuant to this provision, the notice of claim is not required to specify the legal theories upon which the claimant is relying. Instead, the notice of claim is required to state in pertinent part "the time, place and circumstances of the alleged loss of injury" and the amount of compensation demanded.
[ś 24] HCI's notice of claim included over three pages describing in detail the time, place and circumstances of the alleged loss. The notice stated that the claim arose from "The City Hall Expansion Project" that commenced on August 28, 2000, in and for the City of Gillette. It stated that the claim was made by HCI against the City and named eight city officials to whom it was intended to provide notice. It described the circumstances of HCI's bid, quoted the precast specification, stated that the City did not object to the precast supplier HCI listed in its bid, and described Mr. Gillette's statement at the August 31, 2000, project meeting, HCI's efforts to accommodate the City's change to the contract, and the City's responses, or lack thereof, to those efforts. The notice also described HCI's actions after the City rejected or failed to respond to HCI's efforts. It further described the effect of the City's actions and inactions in terms of delaying the project and damages. Additionally, although it was not required, the notice of claim identified HCI's legal theories by stating that the City breached the contract and the implied covenant of good faith and fair dealing.
[ś 25] With respect to the amount of compensation demanded, the notice of claim stated: "The money damages being sought by HCI can be summarized very simply: it is the difference between its bid price and the actual cost incurred by HCI to fulfill its obligation and complete the contract." The notice of claim referenced Exhibit K, Summary of Financial Impact to HCI, which is a one page document attached to the notice that itemized the $1,300,016.57 in damages claimed by HCI. Exhibit K separated the damages into five categories: extended overhead cost impact, direct cost impacts, other costs, insurance and bonding, and sales tax increase. The "direct cost impacts" and "other costs" categories were further broken down into subcategories.
[ś 26] We are at a loss to understand the City's assertion that the notice of claim left it to speculate as to the conduct giving rise to HCI's claim and resulting damages. It is clear from the notice that the conduct giving rise to HCI's claims was, first, the City's action in changing the project specifications and, second, the City's subsequent inaction in the face of HCI's efforts to keep the project on schedule. The notice also clearly sets forth the damages HCI claimed resulted from the City's conduct. Contrary to the City's assertion that HCI's notice of claim "generically-described" the conduct, we conclude that it fully complied with § 1-39-113.[7]

2. Recovery for Breach of the Implied Covenant of Good Faith and Fair Dealing
[ś 27] The City contends that once it established that it did not breach the contract, HCI could not recover for breach of the implied covenant of good faith and fair dealing and the district court erred in not granting its motions for judgment as a matter of law. The City asserts that the event HCI claimed gave rise to the breach of the implied covenant, i.e. Mr. Gillette's August 31, 2000, statement that HCI could not order the precast *196 panels until its supplier was certified, did not breach the contract even if true because the contract unambiguously provided, first, that the architect did not have the authority to bind the City and, second, that all modifications must be in writing. Given these provisions, the City contends, Mr. Gillette's alleged statement had no effect on the contract and did not prevent HCI from ordering the precast panels from its uncertified supplier. Just as Mr. Gillette's statement did not constitute a breach of contract, the City argues, it could not constitute a breach of the implied covenant. The City asserts the issue is one of law subject to de novo review.
[ś 28] HCI contends that a party can breach the implied covenant of good faith and fair dealing without breaching the express terms of the contract. It argues that an implied covenant to cooperate and not interfere with contract performance exists in every contract separate and apart from the express terms. Regardless of the express contract terms, HCI asserts, the jury reasonably could have concluded that the City breached the implied covenant when, during the first months of the contract, its representatives told HCI it could not order the precast panels from Winfrey until Winfrey was certified. Additionally, or alternatively, HCI contends the jury could have concluded the City breached the implied covenant when it did not act on HCI's change order request to substitute Gage Brothers as the precast supplier until it was too late for HCI to meet the scheduled deadline. HCI asserts the question of whether the City breached the implied covenant of good faith and fair dealing was a factual one.
[ś 29] To the extent the City claims the district court erred in denying its motions for judgment as a matter of law, the following standards govern our review:
Judgment as a matter of law should be granted cautiously and sparingly. However, where the evidence is not legally sufficient to support a claim, the district court has an obligation to enter such a judgment. We review de novo a decision to grant or deny judgment as a matter of law, meaning we examine the record anew affording no deference to the district court's views. The test is whether the evidence appearing in the record is such that reasonable persons could reach but one verdict. We view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that may be drawn from the evidence. When the evidence permits more than one reasonable inference or the inferences favorable to the moving party are subject to doubt, the matter is properly for the jury to decide and a motion for judgment as a matter of law must be denied.
Johnson v. Reiger, 2004 WY 83, ś 8, 93 P.3d 992, 995 (Wyo.2004) (citations omitted).
[ś 30] Under Wyoming law, the implied covenant requires that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement. Scherer Constr., LLC v. Hedquist Constr., Inc., 2001 WY 23, ś 19, 18 P.3d 645, 654 (Wyo. 2001). It requires the parties to act in accordance with their agreed common purpose and each other's justified expectations. Id. A breach of the implied covenant occurs when a party interferes or fails to cooperate in the other party's performance. Id.
[ś 31] The implied covenant of good faith and fair dealing may not be used to create new, independent rights or duties beyond those agreed to by the parties. Id. Rather, it must arise from the language used or be indispensable to effectuate the intention of the parties as determined by the contract language, the parties' conduct and their course of dealing. Id. In the absence of evidence of self-dealing or breach of community standards of decency, fairness and reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant. Id.
[ś 32] The question of whether the implied covenant of good faith and fair dealing was breached is ordinarily one of fact, focusing on the conduct alleged as constituting the breach within the context of the contract language, the parties' course of conduct and industry standards. Id. A party is entitled to judgment as a matter of law on *197 the claim only where the actions alleged to have breached the covenant were in conformity with the clear contract language. Id. Where the evidence establishes a material dispute as to whether a party's conduct went beyond the exercise of contract rights and amounted to self-dealing or a violation of community standards of decency, fairness or reasonableness, the issue is one for determination by the fact-finder. Id.
[ś 33] In claiming that it was entitled to judgment as a matter of law on the implied covenant claim, the City points to the following contract provisions:
1.1.1 THE CONTRACT DOCUMENTS
The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect.
. . . .
2.1.1 The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Subparagraph 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.
[ś 34] The contract identified the City as the Owner. Article 7.3 identified the City's representative as Dan Roberts, an Engineer II in the Department of Public Works. The City claims it was entitled to judgment as a matter of law on the implied covenant claim because the evidence was that its actions were in conformity with the contract, i.e. only Mr. Roberts had authority to bind the City; Mr. Gillette did not have such authority; contract modifications were required to be written; there was no written modification of the contract specification requiring certification prior to the start of production; therefore, the City did not breach the implied covenant when Mr. Gillette stated that the "Architect/City needs certification before precast order."
[ś 35] The difficulty with the City's claim is that the evidence established a material dispute as to whether its conduct went beyond the exercise of its contract rights. The evidence created a reasonable inference that, rather than conforming to the agreed common purpose and HCI's justified expectations, the City instead interfered and failed to cooperate with HCI's ability to perform. Scherer, ś 18, 18 P.3d at 653. HCI presented evidence to show that, despite the contract provisions, the City went along with Mr. Gillette's oral modification of the contract specification.[8] Stella Alexander, HCI's office manager, testified that she was present at the August 31 project meeting and that Mr. Roberts nodded his head in agreement when Mr. Gillette stated certification was needed before the precasts were ordered. Rosemary *198 Shubert, HCI's financial officer, who also attended the August 31 meeting, testified Mr. Roberts seemed to agree or at least did not disagree or object to Mr. Gillette's statement. Ms. Alexander also testified that no one from the City objected to, disputed or asked for correction of the minutes of the August 31 project meeting which included Mr. Gillette's statement that certification was needed before the precasts were ordered. The September 14 project meeting minutes also stated that the precast supplier needed to be certified before HCI ordered the precasts and, again, no one from the City objected to the minutes, asked that they be corrected or even pointed out that Mr. Gillette's statement was not correct.
[ś 36] Additionally, Mr. Hladky, who did not attend the August 31 meeting, testified that upon being informed about Mr. Gillette's statement by his employees after the meeting, he went to talk to Mr. Gillette and Mr. Roberts. He testified that he told Mr. Roberts they could not wait to order the precast panels, that was not the deal as stated in the contract specifications and the panels needed to be ordered then. Mr. Roberts' response was that he was responsible for job quality. Mr. Hladky testified that it was clear from Mr. Roberts' response that the City concurred with Mr. Gillette's statement that Winfrey's certification was needed before the panels were ordered. Mr. Hladky testified that after speaking with Mr. Roberts, he had Ms. Alexander send a letter the same day advising Winfrey that it needed its precast certification before HCI could order the panels.
[ś 37] In addition to the evidence tending to show that the City breached the implied covenant when it went along with Mr. Gillette's oral modification of the contract specification, the evidence also permitted a reasonable inference that the City breached the covenant when it did not act on HCI's change order request to substitute Gage Brothers as the precast supplier until after the scheduled deadline had passed. Mr. Hladky testified that after Mr. Gillette told him Winfrey needed to be certified before the precast panels were ordered, he expressed his concern to the City that waiting for the certification to order the panels would delay the project. He testified that by September, when he was still being told he could not place the order until Winfrey was certified, he was considering other options. He offered to hire an inspector to watch the panels being made so as to ensure their quality. Mr. Gillette rejected the proposal because it waived the certification requirement. At his expense, Mr. Hladky offered to take Mr. Gillette to visit Winfrey's plant in the hope that upon seeing the plant Mr. Gillette would allow HCI to order the precast panels before Winfrey received certification. Mr. Gillette rejected that offer as well. Mr. Hladky requested a change order to substitute Gage Brothers, who was already certified, as the precast panel supplier. Ms. Alexander testified that on September 18, 2000, she typed the change order request and sent it to Mr. Gillette. She testified that Mr. Gillette called her a couple of days later and told her to void the request.
[ś 38] Mr. Hladky then set up a special meeting with John Darrington, the city administrator and the primary contact between the City engineers and city council, in the hope that he would approve the change order request to substitute Gage Brothers for Winfrey. Mr. Darrington testified that he attended a meeting on October 5, 2000, with Mr. Hladky, Mr. Gillette and Mr. Roberts. In his October 5 memorandum following the meeting, Mr. Darrington stated that Mr. Hladky asked him to attend because he thought as city administrator Mr. Darrington could approve the change order request to substitute Gage Brothers as the precast panel supplier. Mr. Darrington responded by suggesting that perhaps Mr. Hladky could get Winfrey to assume liability for the damages that would result from the delay caused by the lack of certification.
[ś 39] There is no question from the testimony that the City knew by September or early October of 2000 that the precast panels needed to be ordered or the project would be delayed and damages would result. Yet, the City took no action to allow HCI to order the precast panels from Winfrey or, alternatively, to substitute Gage Brothers as the supplier. By November 14, 2000, when the City *199 finally approved the change order request, the scheduled deadline for the precast panels had passed.
[ś 40] Viewing the evidence in the light most favorable to the nonmoving party, as we must, and giving HCI the benefit of all reasonable inferences that may be drawn from the evidence, we conclude the evidence permitted more than one reasonable inference and the inferences favorable to the City were subject to doubt. Thus, the issue of whether the City breached the implied covenant of good faith and fair dealing by interfering or failing to cooperate with HCI's ability to perform was for the jury to decide and the district court properly denied the motion for judgment as a matter of law.
[ś 41] To the extent that the City contends a breach of the implied covenant claim does not survive after a finding that the contract was not breached, we point to Cathcart v. State Farm Mut. Auto. Ins. Co., 2005 WY 154, ś 25, 123 P.3d 579, 589 (Wyo.2005) in which this Court stated:
[T]he two claims require proof of independent elements and are not mutually dependent, meaning one can be maintained without the other. While an insured may state causes of action for breach of contract and breach of the duty of good faith and fair dealing, the insured does not need to prevail on the breach of contract claim to prevail on the claim for breach of the duty of good faith and fair dealing.
See also, State Farm Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813, 828 (Wyo.1994). The City's legal position is without support.

3. Recovery of Delay Damages
[ś 42] The City claims next that, once the jury found that it did not breach the contract, it was not appropriate to utilize the total cost method of proving damages for breach of the implied covenant. The City contends that the total cost method of calculating damages is disfavored even in breach of contract cases and there is no authority for its use in determining damages where, as here, there was no breach of contract. Even assuming such damages were recoverable for breach of the implied covenant, the City claims HCI did not establish the elements necessary to recover under the total cost method. The City also asserts the exclusive remedy available to HCI was an extension of time, not monetary damages.
[ś 43] HCI responds that the contract allowed the contractor to recover money damages, the jury properly awarded monetary damages for breach of the implied covenant and HCI proved the elements necessary for recovery under the total cost method. These same arguments were made twice during the trial and again after the verdict. The district court ruled against the City and for HCI each time.

a. Contract Remedy for Delay
[ś 44] We begin with the City's claim that the exclusive remedy for delay available to HCI under the contract was an extension of time. The City points to Article 8 of the standard form contract which provides:
8.3.1 If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either ... or by changes ordered in the Work ... or other causes beyond the Contractor's control, . . . then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.
The City further claims that HCI did not follow the contract claims procedures requiring claims, including claims for extension of time, to be filed within 21 days of the event giving rise to the claim. The City asserts HCI waived its right to a time extension by failing to follow the procedures set forth in the contract.
[ś 45] HCI responds that the contract allowed the contractor to recover money damages. It cites the following provisions of the contract:
Article 8.3.3 This Paragraph 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.
. . . .
Article 13.4.1 Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder *200 shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.
HCI references State Highway Comm'n v. Brasel & Sims Constr. Co., Inc., 688 P.2d 871, 877 (Wyo.1984) for the principle that delay damages are available at law. Additionally, HCI quotes William Schwartzkopf, the City's construction expert and author of Calculating Construction Damages (2d ed.2001), as having stated that Article 8.3 of the AIA General Conditions of the Contract for Construction does not preclude delay damages. Id. § 14.02(c), 284.
[ś 46] Implicit in the district court's rulings on the City's motions was the legal conclusion that the contract allowed the recovery of money damages. Courts interpret contracts to effectuate the parties' intention, as expressed in the language of the agreement. Reynolds v. Milatzo, 2007 WY 104, ś 14, 161 P.3d 509, 513 (Wyo.2007). As long as the contract language is clear and unambiguous, our obligation on appeal is to interpret it as a matter of law. Id. The parties to a contract are free to incorporate within their agreement whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the contract. Christensen v. Christensen, 2008 WY 10, ś 13, 176 P.3d 626, 629 (Wyo.2008).
[ś 47] The provisions at issue are part of the general conditions of construction contracts published by the AIA. This Court has considered these provisions in prior cases but has not previously been asked to decide whether they preclude the recovery of money damages. In Quin Blair Enterprises, Inc. v. Julien Constr. Co., 597 P.2d 945, 949 (Wyo. 1979), this Court held that the contractor's failure to submit a written request for an extension of time to complete the project as required by Article 8.3 precluded his claim that he was entitled to credit for the delay caused by the owner. In State Surety Co. v. Lamb Constr. Co., 625 P.2d 184, 192 (Wyo. 1981), we held that Article 8.3 required the contractor to obtain extensions even for delays caused by the owner and the contractor's failure to do so made it liable to the owner for damages resulting from the delay. Both Quin and Lamb involved claims brought by the owner against the contractor for delay damages and in both cases the Court upheld part of the damage award. However, the issue of whether the contract precluded the contractor from recovering money damages for owner caused delay was not raised or discussed.
[ś 48] This Court has adhered to the principle that remedies provided in a contract are generally not exclusive. Dewey v. Wentland, 2002 WY 2, ś 40, 38 P.3d 402, 417 (Wyo.2002); Walters v. Michel, 745 P.2d 913, 915 (Wyo.1987). Rather, such remedies are merely some of several remedies which might be pursued by an injured party. Id. This Court also has found it significant when an agreement does not include a limiting "exclusive remedy" clause or contains a clause recognizing the rights available at law or in equity. Dewey, ś 41, 38 P.3d at 417. Although Dewey and Walters involved disputes about whether the remedies of damages and specific performance were available under the respective contracts, we think the principles espoused in those cases are equally applicable here.
[ś 49] Article 8.3 of the construction contract does not provide that an extension of time was the "exclusive remedy" available for delay. It does provide, however, that the remedies available under the contract were in addition to those remedies available at law. One of the remedies available at law for breach of the implied covenant is contract damages. Therefore, it is reasonable to conclude that an extension of time was not the exclusive remedy available to HCI for City caused delay but was merely one remedy that HCI could pursue.
[ś 50] Moreover, a leading commentator on construction law provides the following example of a typical "no damage for delay" clause:
If the Contractor is delayed by the Owner or Architect or any Agent or employee of either, the Contractor's sole and exclusive remedy for delay shall be the right to a time extension for completion of the Contract and not damages.
*201 Robert F. Cushman and James J. Myers, Construction Law Handbook, § 26.01 (1999). Unlike this provision, the contract provision at issue here does not state that the "sole and exclusive" remedy for delay is a time extension nor does it say recovery of damages is not allowed. We hold that Article 8.3.1 is not a "no damage for delay" clause; therefore it did not preclude HCI from recovering damages and the district court properly reached the same conclusion. We turn to the City's claim that the district court erred in allowing the jury to consider the total cost method in calculating damages.

b. Total Cost Method of Calculating Damages
[ś 51] The total cost method compares the actual costs incurred, plus profit, to the bid amount and seeks the difference. Cushman, supra § 34.02. It is disfavored primarily because it attributes all responsibility to the owner without establishing a clear causal connection between the owner's breach and the increased costs. Id. In Frost Constr. Co. v. Lobo, Inc., 951 P.2d 390, 397-98 (Wyo. 1998), a breach of contract case, this Court said:
The proper measure of damages is the amount of the contractor's extra costs directly attributable to the ... breach [ ]. Obviously, the preferable method for calculating such losses would be to itemize and total the cost of each piece of equipment or material and each man hour necessitated by the unanticipated conditions encountered in performing the contract. Such exactness is not always possible or necessary.
The total-cost method of computing recovery, while generally disfavored by the courts, is permissible where the breach or unexpected conditions pervade substantial areas of performance.... [T]he requirements for use of the total-cost method ... [are proof that]:
(1) the nature of the particular losses make[s] it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses....
(citations omitted).
[ś 52] We applied these principles in Frost to uphold the district court's use of the total cost method for determining contract damages. In Frost, the parties entered into an oral contract in which Frost subcontracted to perform paving work on Lobo's highway construction project. After entering into the original agreement, Frost attempted to add conditions to the agreement. When Frost submitted a new contract containing the conditions and failed to sign and return the original agreement, Lobo hired another company to perform the paving work. Frost filed a breach of contract action and Lobo counter-claimed for breach of contract. The district court concluded Frost breached the contract by failing to perform the paving work and awarded damages based upon the total cost method. We affirmed, finding that the breach pervaded Frost's entire obligation under the contract. See also State Highway Comm'n, 688 P.2d at 880 (holding that use of the total cost method was appropriate under the circumstances).
[ś 53] As reflected in Frost, the preferred method of calculating breach of contract damages under Wyoming law is to itemize the extra costs directly caused by the breach. However, where such precise itemization is not possible, use of the total cost method is permissible if the breach substantially affected performance and the contractor proves the requisite elements. Wyoming has recognized that a breach of the implied covenant of good faith and fair dealing may be actionable in contract for compensatory damages. Cathcart, ś 24, 123 P.3d at 589; Shrader, 882 P.2d at 825. Thus, as is the case for breach of contract damages, damages for breach of the implied covenant may be calculated using the total cost method when the breach substantially affected performance and the requisite elements are proven.
[ś 54] As noted, the City claims it was error to allow the jury to consider the total cost method because HCI did not prove the necessary elements. On that basis, the City moved at the close of the evidence for judgment *202 as a matter of law. Considering the evidence in the light most favorable to HCI as it was required to do, the district court denied the motion and submitted the question of damages to the jury. The City renews its claim of error on appeal.
[ś 55] HCI responds that it proved the required elements of the total cost method; however, that method was only one of the methods used to calculate its damages; therefore, it would not have been appropriate to single out the total cost method for instruction; the general contract damages instruction the district court gave adequately informed the jury concerning the applicable law; and, in any event, the jury did not award damages based upon the total cost method.
[ś 56] To the extent the City claims error in the denial of its motion for judgment as a matter of law on the total cost method, we review the district court's decision de novo, meaning we examine the record anew and afford no deference to the district court's views. Johnson, ś 8, 93 P.3d at 995. If the evidence, viewed in the light most favorable to HCI, permits more than one reasonable inference or the inferences favorable to the City are subject to doubt, the matter was properly for the jury to decide and the district court did not err in denying the motion.
[ś 57] As noted above, the threshold question for use of the total cost method is whether the breach pervaded substantial areas of performance. Frost, 951 P.2d at 398. Mr. Hladky testified that HCI was ready to send out the purchase order for the precast panels when Mr. Gillette changed the deal. He testified that, but for Mr. Gillette's statement and the City's concurrence with it, HCI probably would have ordered the precast panels within a day or so. Mr. Hladky testified that he needed to order the precast panels so that Winfrey could design where the imbeds would be placed in time for the architect to approve them, a process that could take a month, and allow the concrete subcontractor to pour the walls in time for them to cure before the panels arrived.
[ś 58] Mr. Hladky further testified that as the time came and went for Winfrey to meet the deadline, he attempted to obtain a change order to allow him to use Gage Brothers. He testified that HCI still could have met the deadline if the City had approved his request in October. The fact that the approval did not come until November 14 made it impossible for HCI to meet the scheduled deadline for phase 1 of the project.
[ś 59] HCI also presented the expert testimony of Norm Davies, the owner of his own construction company with over forty years experience in construction. Mr. Davies testified that the City's handling of the precast panels had a major impact on HCI, forcing the construction company to change its complete as-bid construction plan. He testified that the panels were the critical element on phase 1 of the project and the delay in ordering them prevented HCI from getting the imbeds, pouring the concrete, receiving and installing the panels, and installing the drywall, studs, electrical and mechanical work. Mr. Davies testified that the delay resulting from HCI's inability to order the precast panels also caused further delay due to weather conditions, loss of productivity and unavailability of subcontractors.
[ś 60] We have already concluded that the evidence was sufficient to allow a reasonable juror to conclude that the City breached the implied covenant of good faith, first, by failing to allow HCI to perform in accordance with the written specification and, second, by failing to issue the change order. We further conclude that the evidence, viewed in the light most favorable to HCI, permitted more than one reasonable inference as to whether the City's breaches substantially pervaded performance under the contract. Therefore, the district court properly denied the City's motion for judgment as a matter of law on the total cost method if HCI presented sufficient evidence of each of the following elements: (1) the nature of the losses made it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) HCI's bid or estimate was realistic; (3) HCI's actual costs were reasonable; and (4) HCI was not responsible for the added expenses. Frost, 951 P.2d at 397.
*203 [ś 61] Addressing the first element, we hold that the evidence, viewed in the light most favorable to HCI, permitted more than one reasonable inference as to whether the nature of HCI's losses made it highly impracticable to determine them with a reasonable degree of accuracy. James Adrian, Ph.D., a professor, lecturer and consultant in the field of construction productivity, estimating, scheduling and accounting, testified that the City's change on the precast supplier certification issue essentially resulted in a different project than HCI bid, the cumulative effect of which was difficult to calculate. Dr. Adrian testified that this circumstance made the total cost method the only appropriate method of figuring financial damage. He stated that it was not possible to accurately calculate productivity after a major disruption like what occurred on this project using any other method. Given this testimony, the evidence was sufficient to permit more than one reasonable inference and judgment as a matter of law would not have been appropriate as to the first element necessary for use of the total cost method.
[ś 62] HCI also presented evidence establishing a reasonable inference on the second element necessary for use of the total cost method, i.e. that its bid was realistic. Mr. Gillette reviewed all of the bids and recommended that the City award the project to HCI. He testified that he had no problem with the amount of the bid and never felt that HCI underbid the project. In fact, the evidence showed that HCI's bid of $3,623,068 was in line with the architect's estimate of $3,700,000 for what the project would cost. Additionally, Mr. Davies testified that the bid was reasonable. He testified that it was clear from comparing HCI's bid with those of other bidders that HCI did not overbid the project. He also testified from his review of the project documents that it was clear HCI did not underbid the project in order to get the job with the intention of then obtaining change orders to increase its profit. He based this conclusion on the fact that only two of the ninety some change orders were initiated by HCI. This evidence was sufficient to raise a reasonable inference as to the second element necessary for calculating damages using the total cost method.
[ś 63] Consistent with the third element, HCI presented evidence that its actual costs were reasonable. Mr. Davies testified that in his opinion, considering that "it was a tough time to get qualified tradesmen and personnel on [job] sites," the costs were reasonable. Dr. Adrian also testified that HCI's actual costs were reasonable. Even the City's own expert testified that a high percentage of HCI's actual costs were reasonable.
[ś 64] Finally, addressing the last element necessary for use of the total cost method, HCI presented evidence that it was not responsible for the added expenses. Mr. Hladky testified that the City was responsible for the added expenses caused by the delay and that none of the expenses included in HCI's claim were attributable to HCI. Mr. Davies also testified that the responsibility for the added expenses lay with the City.
[ś 65] Although the City presented evidence to refute HCI's evidence as to each of the elements necessary for use of the total cost method, it is clear from our review of the record that the evidence presented, viewed in the light most favorable to HCI, supported submission of the total cost method of calculating damages to the jury. We turn to consideration of the City's claim that the district court erred in not adequately instructing the jury concerning the damages evidence.

c. Damage Instructions
[ś 66] In essence, the City claims it was error to instruct the jury only as to the general measure of contract damages and not to instruct also on the elements necessary for recovery using the total cost method. The City contends this error allowed the jury to consider damages without having sufficient guidance as to how to calculate them.
[ś 67] HCI asserts that it presented evidence of alternative methods of calculating damages including, in addition to the total cost method, the modified total cost method and the jury verdict method. Given the evidence as to these alternative methods, HCI contends it would have been improper for the district court to single out the total cost *204 method for a separate instruction. HCI asserts it was appropriate under these circumstances for the district court to instruct the jury as to the general measure of contract damages.
[ś 68] When reviewing claimed error in instructing the jury, we consider whether the instructions, taken as a whole, adequately and clearly advise the jury of the applicable law. Parrish v. Groathouse Constr., Inc., 2006 WY 33, ś 7, 130 P.3d 502, 505 (Wyo.2006). The district court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to that case. Id. A district court's ruling on an instruction will not constitute reversible error absent a showing of prejudice, and prejudice will not be said to result unless it is demonstrated that the instruction confused or misled the jury with respect to the proper principles of law. Id. The burden is on the appellant to show prejudicial error.
[ś 69] The City proposed the following jury instruction:
INSTRUCTION NO. 33
DAMAGESâ TOTAL COST METHOD
If you find that Hladky Construction, Inc. is entitled to recover damages, the proper measure of damages is the amount of the contractor's extra costs directly attributable to the breach. Only in the event that you find that any breach or unexpected conditions pervaded substantial areas of performance, can you revert to the "total cost method" of calculating damages. The "total cost method," as opposed to the preferred method of itemizing each additional cost resulting from the breach, is acceptable only if the following criteria are met:
(1) the nature of the particular losses make[s] it impossible or highly impracticable to determine them with a reasonable degree of accuracy;
(2) Hladky Construction, Inc.'s bid or estimate was realistic;
(3) Hladky Construction, Inc.'s actual costs were reasonable;
(4) Hladky Construction, Inc. was not responsible for the added expenses.
[ś 70] The district court rejected the City's proposed instruction and gave instead the following damages instruction:
INSTRUCTION NO. 13
DAMAGES REASONABLE, NOT SPECULATIVE
If you should find that either Hladky Construction, Inc. or the City of Gillette are entitled to a verdict on their respective claims, you may award only such damages as will reasonably compensate the party for such damages as you find, from a preponderance of the evidence, that it has sustained.
You are not permitted to award speculative damages. So, you are not to include in any verdict compensation for any prospective loss which, although possible, is not reasonably probable to occur in the future.
Your determination as to damages is to be based upon the evidence and not upon sympathy, speculation, passion, prejudice or conjecture.
The district court also instructed the jury that in order to find that the City breached the implied covenant of good faith and fair dealing, it had to find that the breach caused damage to HCI.
[ś 71] In closing argument, HCI asked the jury to award $1,766,338.92 in damages. The jury awarded $1,125,436.77, or $640,902.15 less than HCI requested. In its ruling on the City's post-verdict motions, the district court addressed the City's argument on damages as follows:
The jury's verdict indicates that it did not adopt [the total cost] method, as its damage award differs from that proposed under the total cost method. The jury was presented with a number of proposals and arguments on damages and was free to select those damages which it found to be reasonable.
[ś 72] When a plaintiff seeks to recover based upon the total cost method of calculating damages, the jury must be instructed to apply the method only if the four *205 requisite elements are proven and to award damages only if the plaintiff proved that the defendant's breach caused them. Thus, in Geolar, Inc. v. Gilbert/Commonwealth Inc. of Michigan, 874 P.2d 937 (Alaska 1994) the Alaska Supreme Court held that the trial court erred in admitting total cost evidence without instructing the jury to apply the method only if the four requisite elements were proven and to award damages only if the plaintiff proved that the defendant's breach caused them. Id. at 944-45. The Court held that before allowing the jury to consider the total cost method the trial court must determine whether the evidence created a question of fact as to each element. Upon making that determination, the trial court must then instruct the jury specifically as to each of the elements and that it must find that the plaintiff proved each of the total cost elements before awarding damages based upon that method. Id. at 945. Because the trial court did not instruct the jury accordingly, the Supreme Court reversed the award and remanded for a new trial on the issue of damages. Id. at 946.
[ś 73] We agree that ordinarily when total cost evidence is admitted, a trial court must instruct the jury to use the method only if the four elements were proven and to award damages only if it was shown that the defendant's breach caused them. Ordinarily, a trial court's failure to instruct the jury in this manner when total cost evidence has been admitted constitutes reversible error. Under the particular circumstances of this case, however, we conclude no prejudice resulted from the failure to instruct concerning the total cost method.
[ś 74] In Power Constructors v. Taylor & Hintze, 960 P.2d 20, 41 (Alaska 1998), a case decided after Geolar, the Alaska Supreme Court held that the trial court did not err in allowing the plaintiff to present its case based on the total cost method without instructing the jury in accordance with Geolar. In Power, the trial court did not instruct the jury on the four total cost elements, instructed the jury not to consider the total cost method and instructed the jury to rely on actual cost evidence.
[ś 75] After reviewing the various methods for calculating damages and the evidence presented, the Power Court held there was no error because, while the evidence included information concerning the total cost of delay, it also included detailed testimony concerning the actual construction delays and the contractor's frustrations and economic problems as well as testimony tying the owner's acts to the specific problems the contractor encountered in performing the contract. The Court concluded the jury also heard a significant amount of cost analysis evidence and received significant documentation analyzing each phase of construction. Although some of the analysis was based upon the total cost approach, the Court noted that some of it was in the form of expert opinion and testimony concerning the contractor's actual work experience. The Court stated:
This admixture of evidence left the jury with much more to consider than "the difference between the actual costs incurred on a project, plus a reasonable amount for profit, and the contract price." Geolar, 874 P.2d at 943. In addition to establishing total project costs significantly exceeding the original contract price, the evidence strongly suggested that a substantial amount of PCI's added costs resulted from delayed and out-of-sequence delivery of powerline poles. The evidence also described instances in which A/H misled PCI with regard to pole delivery, and it described the effects of A/H's misrepresentations and negligence on PCI's construction efforts. While PCI never submitted itemized proof of actual added costs attributable to A/H's misconduct, it presented enough information to support a strong inference that A/H had caused PCI a substantial amount of actual harm and to enable the jury to form a reasonable, though perhaps imprecise, estimate of the extent of that harm.
Power, 960 P.2d at 43. On that basis, the Court concluded the trial court properly instructed the jury.
[ś 76] Unlike the situation in Power, the district court here did not instruct the jury not to consider the total cost method or to rely on actual cost evidence. However, the *206 jury heard extensive testimony concerning the actual delay in ordering the precast panels and the problems HCI experienced because of that delay. As in Power, the jury also heard extensive testimony tying the City's acts to the specific problems HCI encountered in performing the job. Also as in Power, the jury heard cost analysis testimony from lay and expert witnesses and received documentation analyzing the actual economic and physical effects the precast panel delay had on other aspects of the project. Although some of the analysis was based upon the total cost approach, some of it was in the form of expert opinion and lay testimony concerning HCI's actual work experience. The evidence strongly suggested that a substantial amount of HCI's added costs resulted from the City-imposed delay in ordering the precast panels and its failure to act on HCI's change order request, which in turn caused subsequent work to be out of sequence.
[ś 77] Given the evidence, we conclude this case is more akin to Power than it is to Geolar. The evidence left the jury with much more to consider than the actual costs incurred, plus profit, as compared to the bid amount. HCI presented enough information to support a strong inference that the City caused it substantial actual harm and to enable the jury to form a reasonable, though perhaps imprecise, estimate of the extent of that harm.
[ś 78] The jury was instructed that to be entitled to damages for breach of the implied covenant of good faith and fair dealing, HCI had to prove by a preponderance of the evidence that the City's breach caused it damages. The jury was also instructed that it could award only such damages as would reasonably compensate HCI for the harm it sustained as a result of the City's breach. Based upon the evidence and the instructions, the jury awarded HCI $1,125,436.77, or $640,902.15 less than the $1,766,338.92 HCI requested. Considering all of the circumstances in this particular case, including the fact that the jury clearly did not calculate HCI's damages using the total cost method, we hold that the City has failed to show that prejudice resulted from the district court's failure to instruct the jury on the total cost method.

4. Change Order as Accord and Satisfaction or Waiver
[ś 79] In its next issue, the City claims the district court erred by not instructing the jury on the issue of accord and satisfaction because it had presented evidence that the change order request the city council verbally approved on November 15, 2000, operated as an accord and satisfaction of HCI's delay claim under Article 7.2.1 of the contract. The City also claims that HCI waived its delay claim by accepting the change order and proceeding to perform under the contract without reserving the claim. HCI asserts there was no evidence to support such an instruction. HCI contends there was no evidence that either party intended the change order to operate as an accord and satisfaction. Without evidence of intent, HCI argues the district court properly refused to give the City's proposed instructions on waiver and accord and satisfaction.
[ś 80] For the change order to operate as an accord and satisfaction, it must clearly have appeared that HCI intended it to operate as such and that the City either expressly agreed to it, or was bound to know of HCI's intention at the time it accepted the change order. Oedekoven v. Oedekoven, 538 P.2d 1292, 1297 (Wyo.1975).
[ś 81] The evidence relevant to this issue showed that after the city council approved the change order request, HCI proceeded to perform under the contract. However, as previously mentioned, HCI also sent the November 28, 2000, letter to Mr. Gillette stating that although it would attempt to complete the project as efficiently as possible, the delays caused by the City had delayed the project, the original schedule was no longer possible and HCI would document the costs of the delay for the City's account. HCI referenced its earlier letter, dated October 30, 2000, in which it had advised Mr. Gillette that "due to the ambiguous specifications there is a potential for a major impact on the schedule causing loss of productivity and increased costs." The October letter also referred to "the cost of delays, litigation, etc."
*207 [ś 82] This documentation suggests that rather than intending to waive or release any claim for damages, HCI intended to keep track of the additional costs resulting from the delay for payment by the City. Mr. Hladky testified that he absolutely did not intend to waive any claim for delay by signing the change order. He testified if that had been his intent he would have put it in writing. He testified that the City representatives did not indicate they considered the change order to be a waiver and, if they had, he would not have signed it.
[ś 83] Consistent with this evidence, the written change order Mr. Gillette finally prepared at the end January of 2001 contains no language, doubtful or otherwise, indicating that it was intended to operate as a waiver or an accord and satisfaction. An accord and satisfaction can never be implied from language of doubtful meaning. Oedekoven, 538 P.2d at 1297. If it cannot be implied from language of doubtful meaning, it certainly cannot be implied from a change order containing no language at all indicating that it was intended to operate as an accord and satisfaction or a waiver. We agree with the district court's conclusion that the change order did not contain language supporting the defenses of waiver or accord and satisfaction. The district court properly declined to submit these issues to the jury.
[ś 84] Within its argument that the district court erred in not submitting the accord and satisfaction and waiver issues to the jury, the City also asserts that the district court erred when it prohibited Mr. Anderson, the city attorney, from testifying concerning the change order. Rulings on the admissibility of evidence are within the sound discretion of the trial court. Barnes v. State, 2008 WY 6, ś 11, 174 P.3d 732, 736 (Wyo. 2008). We will not disturb such rulings absent a clear abuse of discretion. Id. An abuse of discretion occurs when it is shown the trial court reasonably could not have concluded as it did. Id.
[ś 85] The City claimed that Mr. Anderson's testimony was critical to rebut Mr. Hladky's testimony that he did not intend the change order to operate as an accord and satisfaction or waiver of his damage claim. The City asserted that Mr. Anderson was the City's trouble shooter with respect to the change order, he attended the city council meeting where it was addressed and he was the appropriate person to testify concerning the City's intent.
[ś 86] In his deposition taken prior to trial, Mr. Anderson testified that he had no involvement in preparing the change order. He did not review it after it was drafted. He testified his only involvement with the written change order may have been in getting it signed. He testified his memory of the city council meeting was a conversation which he thought focused on the need to move the project forward by getting a precast panel supplier because the one selected by HCI was not certified. He did not remember anything Mr. Hladky or Mr. Roberts may have said at the meeting. He remembered something being said about "no more change orders," which he thought upset Mr. Hladky. He also remembered being glad the change order had been approved and the project was moving forwardâ "it got the contractor out of a horrible spot he was in, moved things on."
[ś 87] We find no abuse of discretion in the district court's ruling. Mr. Gillette drafted the change order and was the best source for testimony concerning what the City intended. While Mr. Gillette may have had discussions with Mr. Roberts concerning the change order, no evidence was presented that Mr. Anderson was involved in those discussions. The city council and the mayor approved the change order and were the best source of testimony concerning what the City intended. No showing was made that Mr. Anderson had knowledge sufficient to allow him to testify concerning the City's intent.

5. Evidence and Jury Instructions on Contract Claim Requirements
[ś 88] The City asserts the district court erred when it failed to enforce the contract provisions governing claims, refused to instruct the jury that HCI was required to comply with those provisions and excluded testimony concerning the authenticity of HCI's notice of claim documents. We address each of these arguments separately.

*208 a. Enforcement of Contract Provisions

[ś 89] The City filed motions for judgment as a matter of law based in part on its assertion that HCI failed to comply with the contract notice provisions. The City argues the district court erred as a matter of law in denying its motions on those grounds. The City cites the following contract provisions:
4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract.
4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.
....
4.3.5 Claims for Additional Cost. If the Contractor wishes to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work.
4.3.6 If the Contractor believes additional cost is involved for reasons including but not limited to ... (7) other reasonable grounds, Claim shall be filed in accordance with this Paragraph 4.3.
4.3.7.1 If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.
....
13.3.1 Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.
[ś 90] Pursuant to these provisions, the City maintained HCI was required to give written notice of its breach of the implied covenant claim to both the architect and the City in person or by certified mail within 21 days after it first recognized at the August 31, 2000, project meeting that it would not be allowed to order the precast panels until Winfrey was certified. The City further argued HCI was required to include in the notice an estimate of the cost and of the probable effect of the delay on the progress of the work. The City contended that HCI failed to comply with these requirements because it did not provide written notice of its claim to the architect and the City in person or by certified mail by September 21, 2000, and did not include an estimate of the cost or probable effect of the delay.
[ś 91] The evidence presented at trial showed that after learning that the City was requiring Winfrey to be certified before HCI placed the precast panel order, Mr. Hladky took a number of steps to move the project along as scheduled and prevent delay. He testified that he met the same day with Mr. Roberts and Mr. Gillette in an effort to persuade them to allow him to place the order. He testified that he also informed Winfrey that day that it needed to obtain its certification before he could place the order. He testified that he offered to take a City representative to inspect Winfrey's plant to ensure that its manufacturing process was adequate to allow HCI to place the order. He proposed hiring an inspector or paying a city representative to watch Winfrey's manufacturing process to assure the quality of the precast panels. He submitted a change order request substituting Gage Brothers as the precast panel supplier on September 18; met with Mr. Darrington on October 5 in the hope of obtaining his approval of the change order request; proposed by letter dated October 30 to deduct the price of the precast panels from HCI's bid and let the City find another supplier; submitted a second change order request to that effect on October 31; *209 and met with the city council to obtain approval of the change order request.
[ś 92] Viewed in the light most favorable to HCI, this evidence raised a reasonable inference that HCI "first recognized the condition giving rise to [its] claim" within the meaning of Article 4.3.2 of the contract only after Mr. Hladky had unsuccessfully exhausted efforts to prevent delay damages. Thus, the 21 days for initiating the claim began to run not on August 31, as the City asserts, but from some later date when HCI recognized there was nothing it could do to prevent the delay. Mr. Hladky testified that he could not put an exact date on when he first recognized the condition giving rise to the claim. He testified, however, that if the City had acted two weeks before the October 31, 2000, notice of claim letter, HCI's subcontractor could have completed the concrete work and much of the delay could have been avoided. On that basis, he testified that HCI first recognized the condition giving rise to its claim when the City had not acted by mid-October of 2000. From this evidence it can reasonably be concluded that the 21 days began to run in mid-October. Thus, HCI's October 31, 2000, letter met the requirements of the contract and the district court's rulings to that effect were proper.
[ś 93] The City asserted the October 31, 2000, letter did not meet the contract requirements because HCI did not deliver it in person or by registered or certified mail. A close look at the language of Article 13.3.1 demonstrates that delivery in person or by registered or certified mail is not mandated. While "written notice shall be deemed to have been duly served if delivered in person... or if ... sent by registered or certified mail," the contract does not preclude service by regular mail. Additionally, Mr. Gillette testified that he received the October 31, 2000, notice of claim; therefore, the evidence was undisputed that he had actual notice of the claim. Given the actual notice, the district court was not willing to conclude that HCI's failure to serve the notice of claim personally or by certified mail was fatal to its claim. We agree.
[ś 94] The City contends that Article 4.3.2 of the contract required HCI to provide written notice of its claim to the architect, Mr. Gillette, and the City and the fact that the October 31 letter went only to Mr. Gillette caused the claim to be legally defective. An abundance of evidence was presented from which it could be reasonably concluded that Mr. Gillette was the City's representative on the City Hall project and that notice to him was sufficient to constitute notice to the City. Given that evidence, the district court concluded that HCI complied with the contract claim provisions.
[ś 95] The City further argues HCI failed to comply with the contract provisions because its October 31, 2000, notice of claim did not include an estimate of the cost and probable effect of the delay. Article 4.3.7.1 applied to claims for additional time. HCI's claim was for the additional costs caused by the delay, not for additional time. The contract did not require submission of an estimate of the cost and effect of the delay for a damages claim.

b. Failure to Instruct on the Contract Provisions
[ś 96] The City contends, without citation to any authority, that the district court erred in failing to instruct the jury that the contract claims provisions were mandatory. The City offered, and the district court rejected, the following instructions:
INSTRUCTION NO. 22(a)
CONTRACT TERMSâ CONDITIONS PRECEDENT
Wyoming law provides that parties can contractually require that certain conditions (conditions precedent) be met prior to a party being able to bring a claim, i.e., to sue the other party.
The Contract between Hladky Construction, Inc. and the City of Gillette provides for certain conditions that have to be met before a Claim can be made by Hladky Construction, Inc. Those condition precedents are found at Articles 4.3.1, 4.3.2, 4.3.5, 4.3.7.1 and Article 13.1. If you find that Hladky Construction, Inc. failed to abide by the Contract's mandatory procedures *210 to establish a Claim, then Hladky Construction, Inc.'s claims against the City of Gillette are barred.
INSTRUCTION NO. 23(a)
WRITTEN NOTICE OF CONTRACT CLAIMS
Hladky Construction, Inc., by and through this lawsuit, is making a claim for additional monies under the Contract between it and the City of Gillette. That Contract provides that a Claim arising out of or relating to the Contract, must be initiated by written notice.
Hladky Construction, Inc. has the burden of proving, by a preponderance of the evidence that, it complied with all contractual requirements regarding procedures for making Claims. If you find that Hladky Construction, Inc. failed to comply with the requirement in Article 4.3.1 that written notice be provided not only to the Architect, but also the City of Gillette's Owner's Representative, Dan Roberts, then you must find that its Claims are barred.
INSTRUCTION NO. 39
PROCEDURE FOR SERVING WRITTEN NOTICE OF CLAIM
Article 13.1 of the General Conditions of the Contract for Construction, (AIA document A201-1997) provides that notice is deemed duly served if delivered in person or if sent by registered or certified mail. If you find that Hladky Construction, Inc. failed to serve its written notice of claim letters in the above manner, then you must find that its Claims are barred.
[ś 97] As we have said, the district court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to the case. Parrish, ś 7, 130 P.3d at 505. A district court's ruling on an instruction will not constitute reversible error absent a showing of prejudice, and prejudice will not be said to result unless it is demonstrated that the instruction confused or misled the jury with respect to the proper principles of law. Id. The burden is on the appellant to show prejudicial error.
[ś 98] The City cites to no authority on the issue of whether a court is required to instruct the jury that contract provisions are mandatory. The cases the City cited to the district court as authority for its proposed instructions do not address the question. Under the facts of this case, we conclude the district court was not required to instruct the jury concerning the individual contract claims provisions. As the City states in its appellate brief, "[m]uch of the five-week trial was devoted to the notice issue." The contract claims provisions were presented to the jury, testimony was presented concerning those provisions and the parties had a full opportunity to argue the impact of those provisions. The contract provisions were sufficiently presented to the jury for consideration without specific instructions from the court concerning them.

c. Exclusion of Testimony
[ś 99] At trial, the City intended to attempt to show that HCI created the October 31, 2000, and November 28, 2000, notices of claim letters after-the-fact and had submitted a low bid on an earlier project with the intent to later file a claim to recover its losses. The City designated Van Ewing, a former part owner and vice president of HCI, to testify that HCI submitted a low bid on another job and filed a claim to recover its losses. Mr. Ewing also would have testified that Mr. Hladky produced a notice of claim on that project that was not in anyone else's file and, when Mr. Ewing asked him about it, Mr. Hladky said it was better if Mr. Ewing did not know about it.
[ś 100] The City also designated Roger Voorhis, the general contractor against whom HCI filed the claim on the earlier job referenced by Mr. Ewing, to testify that Mr. Hladky presented him with a false notice of claim. Additionally, the City designated Gillette city attorney, Charles Anderson, to testify that he searched the City's and the architect's files on the City Hall project and did not find the September 18, 2000, change order request, the October 31, 2000, notice of *211 claim letter or the November 28, 2000, notice of claim letter.
[ś 101] HCI filed motions in limine to exclude Mr. Ewing's, Mr. Voorhis' and Mr. Anderson's testimony. The district court granted the motion as to Mr. Anderson's testimony on the grounds that it was cumulative of other testimony indicating that the documents were not in the City's files. The district court also granted the motion as to Mr. Ewing's and Mr. Voorhis' testimony on the ground that it would divert the jury's attention from the issue before it and would likely have led to a trial within a trial in that upon the City's presentation of the testimony, HCI would have wanted to present rebuttal testimony.
[ś 102] Rulings on the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed by this Court absent a clear abuse of discretion. Barnes, ś 11, 174 P.3d at 736. We find no abuse of discretion in the district court's rulings excluding the testimony at issue. Mr. Anderson's testimony that the documentation was not in the City's or architect's files was cumulative of the testimony of other witnesses indicating that the notices of claim and the change order request were not in the files and were first seen at the mediation or just prior to trial. Mr. Voorhis' and Mr. Ewing's testimony did not relate to the project at issue, involved different parties and circumstances and would have led HCI to present rebuttal evidence in an already lengthy trial. Moreover, as the district court concluded, the City was able to attack Mr. Hladky's credibility and character sufficiently by other means. Viewing the totality of the trial evidence and testimony, we hold that the district court reasonably concluded that "more of the same would not have produced a different result."
[ś 103] The City argues that whether or not the district court's initial ruling was proper, once HCI opened the door to evidence concerning the veracity of its business practices, evidence to refute its claims was admissible. The City asserts the district court erred at that point when it prohibited Mr. Ewing's testimony on the ground that it was "not of sufficient importance to justify the time that would be necessary to explore it." Whether or not the door was opened, the district court reasonably could have concluded that any probative value of the earlier alleged incident was outweighed by the specter of a trial within a trial as the City tried to prove HCI's actions on the earlier project. Armstrong v. Hrabal, 2004 WY 39, ś 48, 87 P.3d 1226, 1242 (Wyo.2004). We hold the district court did not err in precluding the testimony in question.

6. Attorney Fees

a. Prevailing Party in Suit to Enforce Rights Under the Contract
[ś 104] In claiming that the district court improperly awarded HCI attorney fees, the City argues first that HCI was not entitled to the award because it did not prevail on the breach of contract claim. The City cites Article 13.8 of the contract which provided:
In the event either party files suit to enforce their rights under the Contract Documents, the prevailing party in such suit shall be entitled to recover all costs of the suit, and any subsequent appeal of such suit, including reasonable attorney fees, from the other party, in addition to any other damages awarded by the court.
Emphasizing the phrase "to enforce their rights under the Contract Documents," the City contends the only basis for recovery of attorney fees under the contract was a suit for breach of the express provisions of the contract. Because the jury found that it did not breach the contract, the City argues that HCI was not entitled to attorney fees.
[ś 105] To reiterate, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and its enforcement. Scherer, ś 17, 18 P.3d at 652. Accordingly, parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing based upon a contract theory. Id. One of the rights a party may seek to enforce under the contract is the right to good faith performance by the other party. Under the contract at issue in this case, the prevailing party in a suit to enforce its rights was entitled to attorney fees. Upon prevailing on its claim *212 that the City breached the covenant implied in the contract in its suit to enforce its rights to good faith and fair dealing, HCI was entitled to recover reasonable attorney fees. We hold that the district court properly awarded HCI attorney fees after it prevailed on its breach of the implied covenant claim.

b. Judicial Estoppel
[ś 106] The City argues HCI should have been judicially estopped from seeking attorney fees under the contract because it took the position throughout the trial that upon the City's breach, the contract no longer applied. The City argues it is inconsistent to argue the contract does not apply and then to seek attorney fees under the contract. The City raised these same arguments in its opposition to HCI's post-trial motion for attorney fees.
[ś 107] The doctrine of judicial estoppel is intended to prevent a party from playing fast and loose with the courts or trifling with judicial proceedings. Shepard v. Beck, 2007 WY 53, ś 10, 154 P.3d 982, 986 (Wyo.2007). It is an expression of the maxim that one cannot blow hot and cold in the same breath, meaning a party will not be allowed to maintain inconsistent positions in judicial proceedings. Id. Thus, when a party is successful in a position taken in a previous court proceeding, that position rises to the position of conclusiveness for purposes of later court proceeding. Wilson v. Lucerne Canal and Power Co., 2007 WY 10, ś 26, 150 P.3d 653, 663 (Wyo.2007). Judicial estoppel bars only the changing of position in regard to facts; it does not apply to legal conclusions based upon facts. Id., ś 28, 150 P.3d at 664, n. 6.
[ś 108] At the close of HCI's case in chief, upon the City's motion, the district court granted judgment as a matter of law on HCI's cardinal change claim. The jury was not instructed that upon a finding that one party breached the contract or the implied covenant, the other party was relieved from performing under the contract. Regardless of the evidence or arguments HCI presented, the case was given to the jury as a breach of contract and/or breach of the implied covenant case. Upon the jury finding that the City breached the implied covenant contained in the contract, HCI was entitled to recover reasonable attorney fees. The district court did not err in ruling as a matter of law that HCI was not judicially estopped from seeking attorney fees.

c. Segregation of Attorney Fees
[ś 109] The City argues that HCI was required to segregate its attorney fees between its successful and unsuccessful claims and should not have been awarded fees for its breach of contract claim. On appeal of an award of attorney fees, the burden is on the party attacking the district court's ruling to show an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did. Burnett v. Steeley, 2008 WY 94, ś 35, 190 P.3d 132, 139 (Wyo.2008). In State Surety Co., 625 P.2d at 184, we required apportionment of attorney fees based upon the distinct nature of the issues in the suit between the subcontractor and the owner and the suit between the general contractor and the owner. In that case, we concluded counsel for the owner was engaged in distinct activities that related only to one matter or the other. More recently, in Forshee v. Delaney, 2005 WY 103, ś 16, 118 P.3d 445, 450 (Wyo.2005), we could not say that counsel for Delaney could so distinctly divide his activities. We concluded instead that the defense of Forshee's counterclaim was inextricable from pursuing Delaney's claim for breach of contract and payment of the invoices related to that contract. In Forshee, the issue was whether or not Forshee owed Delaney money and if so, how much. Had Forshee been successful in his counterclaim, his damages would have offset the amount he owed to Delaney, rendering his counterclaim a necessary aspect of Delaney's suit to collect the past due invoices.
[ś 110] The same can be said in this case. HCI's breach of the implied covenant claim was inextricably intertwined with its breach of contract claim. We cannot say, and neither could the district court, that counsel was engaged in distinct activities when pursuing one claim or the other. The issue was whether there was a breachâ of *213 contract or the implied covenantâ and, if so, how much HCI was damaged. We hold the district court did not abuse its discretion by refusing to require HCI to allocate its fees between the two claims.

d. Reasonableness of the A ward
[ś 111] The City's final claim is that the district court abused its discretion in awarding certain fees and costs to HCI. HCI responds that the district court properly exercised its discretion in awarding HCI $37,133.83 less than that for which it applied.
[ś 112] Wyoming has adopted the two-factor federal lodestar test to determine the reasonableness of attorney fee awards. This test requires a determination of whether: 1) the fee charged represents the product of reasonable hours times a reasonable rate; and 2) other factors of discretionary application should be considered to adjust the fee upward or downward. Forshee, ś 7, 18 P.3d at 448. The City claims the award was unreasonable in three ways: first, the district court allowed a $15/hour increase in lead counsel's hourly rate after the jury rendered its verdict and the fee-shifting provision of the contract became operative; second, the district court awarded fees for time HCI's counsel spent preparing motions which the court refused to consider because they were untimely and improper; and third, the district court awarded HCI costs for computer assisted legal research.
[ś 113] Addressing the issue of the increase in lead counsel's hourly rate, HCI asserts that the increase was not related to the verdict or the fee-shifting provision. HCI contends that the increase occurred when Mr. Hladky learned during the first week of trial that, in contrast to the $165/hour per hour his attorney was charging, the City's attorneys were charging $195/hour. According to lead counsel's affidavit, Mr. Hladky thought it fair that he receive $180.00/hour for his trial work and he agreed to charge that amount beginning June 1, 2007. For his work prior to June 1, 2007, including pre-trial preparation and the first week of trial, Mr. Hladky's lead counsel charged $165/hour.
[ś 114] The hourly fee HCI's counsel charged for trial work beginning June 1, 2007, was $15/hour less than the hourly rate the City's counsel charged and $20/hour less than the hourly rate this Court deemed reasonable in Morrison v. Clay, 2006 WY 161, ś 19, 149 P.3d 696, 702 (Wyo.2006). HCI attached to its motion for attorney fees the affidavit of another attorney, who attested to the reasonableness of the fees. We conclude the district court did not abuse its discretion in awarding fees at the rate of $180/hour beginning the second week of trial.
[ś 115] We likewise find no abuse of discretion in the district court's determination that fees were appropriate for time incurred in preparing motions that it did not ultimately consider. The district court presided over this matter for several months before trial during which time it heard and decided numerous motions. It then presided over the five week trial when it considered and decided the parties' motions. In awarding attorney fees, the district court specifically considered the City's objection to fees incurred in preparing motions which it ultimately did not consider. The district court concluded "these [were] reasonable activities for attorneys to undertake."
[ś 116] Finally, we address the City's claim that the district court improperly awarded costs for computer assisted legal research. The City cites Snyder v. Lovercheck, 992 P.2d 1079, 1092 (Wyo.1999) in which this Court concluded that computer research expenditures are included within attorney fees and are not taxable as costs. We find no reference to computer assisted legal research as a cost in HCI's attorney billing statement. Citing Snyder, the district court concluded that legal research fees are recoverable as attorney fees but not as costs. We affirm the district court's award.

CONCLUSION
[ś 117] HCI fully complied with the § 1-39-113 and Art. 16, § 7 of the Wyoming Constitution. Therefore, this Court and the district court had subject matter jurisdiction to proceed with the matter presented. The district court properly denied the City's motion *214 for judgment as a matter of law on HCI's claim for breach of the implied covenant of good faith and fair dealing. The City failed to meet its burden of proving prejudice resulted from the district court's failure to instruct the jury concerning the requisite elements of the total cost method of calculating damages. The district court properly handled the contract claims procedures. As a matter of law, the January 2001, change order did not constitute an accord and satisfaction or a waiver of HCI's claim for delay damages. The district court did not abuse its discretion in awarding attorney fees.
[ś 118] Affirmed.
NOTES
[1] In fact, Winfrey was certified to manufacture structural precast panels. The City Hall project required certification for manufacturing architectural precast panels. Winfrey was not certified for architectural precast panels.
[2] Article 6.3.3 of the contract provided:

Prior to the award of the Contract, the Architect will notify the Bidder in writing if either the Owner or Architect, after due investigation, has reasonable objection to a person or entity proposed by the Bidder. If the Owner or Architect has reasonable objection to a proposed person or entity, the Bidder may, at the Bidder's option, (1) withdraw the Bid, or (2) submit an acceptable substitute person or entity with an adjustment in the Base Bid or Alternate Bid to cover the difference in cost occasioned by such substitution. The Owner may accept the adjusted bid price or disqualify the Bidder.
[3] Webster's On-Line Dictionary, www.websters-online-dictionary.org, defines "imbed" in the context of building and civil engineering as follows: "Tensioned wires within the beam which are either bonded to the concrete ... or are held between firm anchorages embedded in each end of the beam." Mr. Hladky testified that, in addition to delaying production of the precast panels, the specification change requiring Winfrey to be certified delayed the design for the walls which would have shown where the imbeds needed to be placed when the concrete was poured. The delay in the design had the further effect of delaying the concrete work.
[4] Article 4.5 of the contract provided in pertinent part:

4.5.1 Any Claim arising out of or related to the Contract ... shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to ... the institution of legal ... proceedings by either party.
[5] In its ruling, the district court stated that it was not persuaded Wyoming law recognizes the cardinal change doctrine; even if the claim is recognized, the facts were insufficient to support the claim; and, even if the facts were sufficient, HCI waived the claim by continuing to perform under the contract.
[6] Art. 16, § 7 provides:

No money shall be paid out of the state treasury except upon appropriation by law and on warrant drawn by the proper officer, and no bills, claims, accounts or demands against the state, or any county or political subdivision, shall be audited, allowed or paid until a full itemized statement in writing, certified to under penalty of perjury, shall be filed with the officer or officers whose duty it may be to audit the same.
[7] In considering the City's claim that it had to speculate as to the conduct giving rise to HCI's claim, it is of some interest that HCI first presented its claim to the City by letter dated September 10, 2002. It provided more detail and reduced the damage amount it was claiming in a subsequent letter dated April 25, 2003. The parties then attempted to resolve the dispute through mediation with the AIA. After three sessions, the parties appeared to be at an impasse. Only then did HCI proceed with a formal notice of claim. Although actual notice of a claim does not excuse a failure to comply with the Wyoming Governmental Claims Act, when, as here, a party is involved in lengthy efforts to resolve a claim through mediation and then, when those efforts prove unsuccessful, receives a detailed notice of claim, it is difficult to imagine the party did not understand the basis for the claims.
[8] In addition to the evidence showing the City went along with Mr. Gillette's change to the contract, there was substantial evidence from which the jury could reasonably conclude that Mr. Gillette had the authority to bind the City at least on some matters. Article 4.2.1 of the contract provided that the architect was to administer the contract and was the City's representative during construction. Article 4.2.2 provided that the architect, as the City's representative, was to guard the City against construction defects and deficiencies. Article 4.2.4 provided that the City and HCI were to communicate through the architect. Article 4.2.6 gave the architect authority to reject work that did not conform to the contract. Article 4.2.7 required the architect to review HCI's submittals for checking conformance with the contract. Article 4.2.8 required the architect to prepare change orders. Article 4.2.11 required the architect to interpret and decide matters concerning performance under and requirements of the contract on written request of HCI or the City. Articles 4.4.1 and 4.4.5 required claims to be submitted to the architect and provided that the architect's decision concerning any claim was final and binding on the parties subject to mediation.