**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

DENBURY ONSHORE, LLC, a Delaware
Limited Liability Company,

    Plaintiff - Appellant,

v.

ROBERT F. CHRISTENSEN; JANET K.
CHRISTENSEN,

    Defendants - Appellees.

No. 15-8106
(D.C. No. 2:14-CV-00019-ABJ)
(D. Wyo.)

———————————————————

**ORDER**
———————————————————

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.
———————————————————

This matter is before the court, *sua sponte*, to correct small clerical errors in the

dissent filed with the Order and Judgment issued in this matter on January 5, 2018. The

corrected dissent and the Order & Judgment are attached to this order. The Clerk is

directed to file the corrected version of the dissent and the Order and Judgment *nunc pro*

*tunc* to the original filing date.


    Entered for the Court


    ELISABETH A. SHUMAKER, Clerk

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DENBURY ONSHORE, LLC, a Delaware
Limited Liability Company,

     Plaintiff - Appellant,

v.

ROBERT F. CHRISTENSEN; JANET K.
CHRISTENSEN,

     Defendants - Appellees.

No. 15-8106
(D.C. No. 2:14-CV-00019-ABJ)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **KELLY,** and **MORITZ**, Circuit Judges.
_____

Denbury Onshore, LLC, the operator of an oil and gas recovery unit, brought

this declaratory judgment action against Robert and Janet Christensen after the

Christensens denied Denbury access to their land that overlies the unit. The

Christensens asserted counterclaims for declaratory relief, trespass, and breach of the

implied covenant of good faith and fair dealing. A jury ultimately found in the

Christensens' favor on all of their counterclaims and awarded the Christensens over

$1.7 million in damages.

Because Denbury was entitled to judgment as a matter of law on the

Christensens' implied-covenant claim, we reverse the district court's denial of

Denbury's motion for summary judgment on that claim and remand with directions to

_____

[*] This order and judgment isn't binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

vacate the judgment against Denbury as to that claim and the $1,751,991.00 contract damages award. Finding no other reversible errors, we affirm the remainder of the judgment.

## I

Denbury operates the Hartzog Draw Unit, a state-approved, federally certified oil and gas secondary recovery unit in Wyoming. All of the mineral interests underlying the Unit—which are owned by the United States, Wyoming, or private individuals and entities—are committed to the Unit for development. Robert and Janet Christensen own the surface rights to about 16,000 acres of land overlying the Unit. Over 100 Unit wells and hundreds of miles of Unit roads are currently located on the Christensens' land.

Denbury's right to access and use the Christensens' land for Unit operations is governed by the Stock-Raising Homestead Act (SRHA) of 1916, 43 U.S.C. §§ 299, 301, the Wyoming Split-Estate Act (WSEA), Wyo. Stat. Ann. §§ 30-5-401 to 30-5-410, and a federally approved unitization agreement (the Unit Agreement). Under federal and state law, Denbury has the right to enter upon and use as much of the Christensens' land overlying the Unit as is reasonably incident to or reasonably necessary for Unit operations. *See* § 299(a) (providing that lessees of federal mineral interests reserved to the United States through patents issued under the SRHA "may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of [those] minerals"); Wyo. Stat. Ann. § 30-5-402(a) (providing that "[a]ny oil and gas operator having the right to any oil or gas underlying the surface of land may locate and enter the land for all purposes

2

reasonable and necessary to conduct oil and gas operations to remove the oil or gas underlying the surface of that land").

The Unit Agreement similarly provides Denbury "the exclusive right, privilege, and duty of exercising any and all rights of the parties [to the Unit Agreement], including surface rights, which are necessary or convenient for [Unit operations]." App. vol. 1, 47-48. The Christensens joined the Unit Agreement in 1980. And as parties to the Unit Agreement, the Christensens "grant[ed] [Denbury] the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for the operation and the development of the Unit Area." *Id.* at 49.[1]

While it is clear that Denbury has rights to enter onto the Christensens' land and use as much surface as reasonably necessary for Unit operations, the dispute in this case centers on whether Denbury properly exercised those rights. Before Denbury can exercise its rights to enter and use the Christensens' land for Unit operations, it must meet certain preconditions. Under the SRHA, Denbury must first provide written notice of its intent to enter onto the land and it must (1) obtain the Christensens' written consent or waiver, (2) pay for damages to their crops or other tangible improvements, or (3), in lieu of meeting either of these two requirements,

---

[1] The United States is also a party to the Unit Agreement. By joining and certifying the Unit Agreement, the government dedicated all of its federal mineral interests underlying the Unit to the Unit for development. Thus, as we recently held, under the SRHA and federal unitization provisions incorporated into the Unit Agreement, Denbury has the right to "enter and occupy the surface above any leasehold in the [Unit] to the extent that surface access is reasonably incident to mining in any leasehold in the [Unit]." *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1256 (10th Cir. 2014).

3

post a federal bond. 43 U.S.C. § 299; 43 C.F.R. § 3814.1; *see also Entek*, 763 F.3d at 1256 n.1 (explaining that unit operator must satisfy SRHA preconditions before entry).

Similarly, the WSEA requires that Denbury first provide written notice of its entry and the nature of its proposed operations, attempt good-faith negotiations to reach a surface use agreement, and (1) secure the Christensens' written consent to entry or waiver of the consent requirement, (2) obtain an executed surface use agreement providing "compensation to [them] for damages to the land and improvements as provided in [Wyo. Stat. Ann. §] 30-5-405(a)," (3) secure a waiver as provided in Wyo. Stat. Ann. § 30-5-408, or (4) "[i]n lieu of" securing written consent or waiver or obtaining a surface use agreement, execute "a good and sufficient surety bond or other guaranty to the [Wyoming Oil and Gas Conservation Commission (WOGCC)] . . . to secure payment of damages." Wyo. Stat. Ann. § 30-5-402(c).

The parties have a surface use agreement for some Unit operations. In 1983, former Unit operator Cities Service Oil and Gas Corporation (Cities Service) and the Christensens entered into a surface damage agreement (SDA) for certain existing wells and roads. The parties intended the SDA to "supersede, cancel and replace certain agreements between [the Christensens] and previous operators of [the existing] wells as to annual payments on the properties described [in the SDA]." App. vol. 15, 2454-55. The SDA "addresses only annual payments due" for the rights-of-way, site payments, and easements described in the SDA. *Id.* at 2454. Thus, under the terms of the SDA, Cities Service agreed to make annual payments to the Christensens

4

for damages caused by Unit operations related only to the existing wells and roads specifically identified in the SDA. As the current Unit operator and successor-in-interest to Cities Service, Denbury is bound by the terms of the SDA. And, since it began operating the Unit in 2012, Denbury has made annual payments to the Christensens for the wells and roads identified in the SDA.

But Cities Service and the Christensens also agreed that the SDA "can be ammended [sic] so as to add rights-of-way, easements, and site payments" for future Unit operations by revising "Exhibit 'A' and Exhibit 'B' to the [parties'] mutual satisfaction." *Id.* at 2450; *see also id.* at 2455 ("Exhibits 'A' and 'B' may be amended by adding to or deleting roads or sites covered under their Agreement by written approval of both the Owners and Operator.").

Denbury's troubles with the Christensens began when it adopted a new policy for negotiating future surface damage agreements with all Unit surface owners. In the summer of 2013, Denbury advised the Christensens that it would no longer seek easements or rights-of-way from them for planned roads, flow lines, or power lines because Denbury "owns the right of ingress and egress across the entire Hartzog Draw Unit" under the terms of the Unit Agreement. Supp. App. 1. Denbury further advised them that it would no longer make annual payments for such improvements. Denbury would instead "offer multiple times the fair market value" and make one-time, lump-sum payments for new Unit operations. *Id.*

In late 2013 and early 2014, Denbury notified the Christensens in writing that it planned to drill five new wells and build a 1500-foot road on one particular section of their land—Section 3—to connect two existing roads. Consistent with its new

policy, Denbury offered the Christensens one-time, lump-sum payments for each well and the Section 3 road. Denbury advised the Christensens that if they accepted the offers, Denbury would consider their acceptance as their agreement to amend the SDA to add the new operations and to reflect the one-time payments as full compensation for the same. The Christensens refused Denbury's offers and counteroffered, seeking $2,500/acre initial payments and $2,500/acre annual payments for each well and the road. Denbury rejected the counteroffers.

Despite the failed negotiations and the absence of either a new surface use agreement or an agreement to amend the SDA with respect to damages payments for the new operations, and without posting a federal or state bond, Denbury began preliminary work on the Section 3 road on January 14, 2014.[2] The next day, Robert Christensen ordered Denbury to cease road construction, threatened to charge Denbury with trespassing, and told Denbury not to return without a court order.

On January 17, 2014, the WOGCC approved Denbury's permit to drill one new well on Section 14 of the Christensens' land. Denbury posted a bond with the WOGCC as security for damages, and the WOGCC approved the bond over the Christensens' objection. Ten days later, Denbury informed Robert Christensen that it planned to enter onto Section 14 to begin work on the new well. Christensen told Denbury it had no right to enter Section 14 and again threatened to sue Denbury for trespass.

---

[2] Denbury submitted a "Certification Statement" to the WOGCC in July or August 2014 indicating that it provided the Christensens notice, it attempted good-faith negotiations to reach a surface use agreement, and it would post "[a] good and sufficient bond" with respect to the Section 3 road. Supp. App. 2.

6

On January 29, 2014, Denbury brought this action against the Christensens, seeking (1) an injunction and damages related to the Christensens' interference with Denbury's work on the Section 14 well (first and second claims), (2) an injunction to prevent the Christensens from interfering with Denbury's work on the Section 3 road (third claim), and (3) two declarations regarding the scope of Denbury's rights to the reasonable use of the Christensens' land within the Unit (fourth and fifth claims).

The Christensens responded with four counterclaims. First, they sought a declaration that Denbury failed to comply with the WSEA's good-faith negotiations requirement before entering onto the Christensens' land to conduct operations relating to the five new wells. Second, they sought a declaration that the Section 3 road was not reasonably necessary to development of the underlying lease or, alternatively, to any Unit operations. Third, the Christensens asserted a trespass claim. Specifically, they alleged (1) that Denbury's entry onto their land to conduct operations relating to the five new wells was unlawful because Denbury failed to comply with the WSEA's good-faith negotiations requirement, and (2) that Denbury's entry onto Section 3 to construct the new road was unlawful because the road was not reasonably necessary for development of the Unit. Finally, the Christensens asserted a claim based on Denbury's offer to amend the SDA. They alleged that Denbury breached the implied covenant of good faith and fair dealing "by failing to negotiate in good faith in adding new wells and roads as amendments to the [SDA], and by willfully seeking to avoid the terms of the [SDA]." App. vol. 3, 485.

7

Denbury moved for summary judgment on its third and fourth claims and the Christensens' implied-covenant and trespass claims. The district court denied the motion, concluding that genuine disputes as to material facts precluded summary judgment on those claims. The court dismissed Denbury's fifth claim for lack of jurisdiction.[3] The case proceeded to a jury trial only on the Christensens' four counterclaims.[4] At the close of the Christensens' evidence, Denbury moved for judgment as a matter of law on the Christensens' trespass and implied-covenant claims. *See* Fed. R. Civ. P. 50(a). The district court denied the motion.

On the Christensens' two claims for declaratory relief, the jury found that (1) Denbury failed to attempt good-faith negotiations to reach a surface use agreement before entering onto the Christensens' land, as required by the WSEA; and (2) the Section 3 road wasn't reasonable and necessary for Unit operations, as required by the WSEA. Regarding the Christensens' two remaining claims, the jury found that Denbury (1) trespassed when it entered onto the Christensens' land to begin or complete work on the new wells and the Section 3 road, and (2) breached the implied covenant of good faith and fair dealing by failing to negotiate in good

_____

[3] When Denbury moved for summary judgment, it advised the district court that it wasn't pursuing its first and second claims because the Christensens had by then permitted Denbury's access to Section 14. Denbury confirms in its opening brief that these claims were moot by the time Denbury sought summary judgment and that these claims are not at issue in this appeal.

[4] Before trial, the parties stipulated that Denbury had no remaining issues of fact to submit on its third and fourth claims and that the only remaining factual issues arose under the Christensens' counterclaims. The parties jointly moved the court for an order realigning the parties, and the court granted the motion. Thus, for trial purposes the Christensens were the plaintiffs and Denbury was the defendant.

8

faith when it offered to amend the SDA. The jury awarded the Christensens

$1,751,991.00 in contract damages and $801.00 in trespass damages.

After the district court entered final judgment, Denbury renewed its Rule 50

motion, asking the court to vacate the jury's findings and both damages awards. *See*

Fed. R. Civ. P. 50(b). Denbury also moved for remittitur or, alternatively, for a new

trial, arguing that the contract damages award was excessive. *See* Fed. R. Civ. P. 59.

The district court denied both motions. Denbury appeals.[5]

## II

Denbury primarily challenges the judgment against it on the implied-covenant

claim and the contract damages award, asserting that the district court erroneously

(1) denied its motion for summary judgment and its Rule 50 motions for judgment as

a matter of law on the implied-covenant claim, (2) admitted certain evidence relating

to the contract damages award, and (3) denied its motion for remittitur or a new trial

based on an excessive contract damages award. Additionally, Denbury asserts that

the district court erroneously (1) dismissed its fifth claim for lack of jurisdiction,

(2) ruled that the Unit Agreement doesn't satisfy the SRHA's written-consent

---

[5] After Denbury docketed its appeal, we issued a show cause order questioning our jurisdiction because it wasn't clear whether the district court finally adjudicated all claims. We specifically questioned whether the district court finally resolved Denbury's five claims because the final judgment referenced only the Christensens' four counterclaims. Denbury's response clarified that the district court dismissed Denbury's first and second claims as moot, dismissed its fifth claim as nonjusticiable, and disposed of its third claim by adopting the jury's findings on the Christensens' second counterclaim. And while Denbury incorrectly suggested in its response that the district court also dismissed its fourth claim as nonjusticiable, the record supports that the fourth claim too was resolved when the district court adopted the jury's findings against Denbury on the Christensens' second counterclaim. Thus, we are satisfied that the district court finally adjudicated all claims and that we have jurisdiction under 28 U.S.C. § 1291.

requirement, and (3) denied its motion to stay the trial to allow the Bureau of Land Management (BLM), rather than a jury, to decide whether the Section 3 road was reasonable and necessary for Unit operations.

**A**

Denbury first argues that the district court erred in denying its motions for summary judgment and judgment as a matter of law on the implied-covenant claim.

We review de novo the district court's denial of Denbury's motions for summary judgment and judgment as a matter of law, applying the same standards as the district court. *Arnold Oil Props. LLC v. Schlumberger Tech. Corp.*, 672 F.3d 1202, 1206 (10th Cir. 2012). "We grant judgment as a matter of law 'if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law.'" *Id.* (quoting *Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1216 (10th Cir. 2002)). In a diversity action, "the substantive law of the forum state controls the analysis of the underlying claims." *Wolfgang v. Mid-Am. Motorsports, Inc.*, 111 F.3d 1515, 1522 (10th Cir. 1997).

Wyoming law recognizes an implied covenant of good faith and fair dealing in all commercial contracts. *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 919 (Wyo. 2010). The implied covenant "requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 18 P.3d 645, 653 (Wyo. 2001). "Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party." *Id.*

10

But the benefit of the agreement, the agreed common purpose, and the parties'

justified expectations are derived from the specific terms of the contract. *See id.*

(explaining that "[t]he implied obligation 'must arise from the language used or it

must be indispensable to effectuate the intention of the parties'" (quoting *Garrett v.*

*BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990))). The implied covenant may not

"be construed to establish new, independent rights or duties not agreed upon by the

parties." *Id.*; *see also Nationwide Emerging Managers, LLC v. Northpointe Holdings,*

*LLC*, 112 A.3d 878, 881 (Del. 2015) (explaining that honoring express contract terms

"prevents a party . . . from using the implied covenant of good faith and fair dealing

to obtain in court what it could not get at the bargaining table"); *Wilder v. Cody*

*Country Chamber of Commerce*, 868 P.2d 211, 221 (Wyo. 1994) (noting that the

implied covenant can't "create duties that supersede express provisions of written

contracts").

Consequently, whether a party has breached the implied covenant "is a factual

inquiry that focuses on the contract and what the parties agreed to." *Scherer*, 18 P.3d

at 654 (quoting *Gilmore v. Duderstadt*, 961 P.2d 175, 182 (N.M. Ct. App. 1998)); *see*

*also City of Gillette v. Hladky Constr., Inc.*, 196 P.3d 184, 196 (Wyo. 2008)

(explaining that in determining whether breach occurred, one "focus[es] on the

conduct alleged as constituting the breach within the context of the contract

language, the parties' course of conduct[,] and industry standards").[6] But "a party is

---

[6] In arguing that there is a legally sufficient evidentiary basis for their implied-covenant claim, the Christensens assert that the jury properly considered the WSEA's good-faith-negotiations requirement as "evidence of 'industry standards' that are applicable to oil and gas operators in the State of Wyoming." Aplee. Br. 31. They

11

entitled to a judgment as a matter of law 'if, under the facts in the record, the party's actions alleged as [the] basis for the breach . . . were in conformity with the clear language of the contract.'" *Ultra Res., Inc.*, 226 P.3d at 920 (quoting *Scherer*, 18 P.3d at 654 n.2).

Denbury argues it was entitled to judgment as a matter of law on the implied-covenant claim because the plain language of the SDA permits either party to refuse to amend the SDA unless both parties agree to the terms of the amendment. Again, the parties expressly agreed that the SDA "*can* be ammended [sic] so as to add rights-of-way, easements, and site payments" for future Unit operations by revising "Exhibit 'A' and Exhibit 'B' to the [parties'] *mutual satisfaction*." App. vol. 15, 2450 (emphases added); *see also id.* at 2455 ("Exhibits 'A' and 'B' *may* be amended by adding to or deleting roads or sites covered under their Agreement by written approval of both the Owners and Operator." (emphasis added)). In particular, Denbury argues that the language of the contract (1) providing that the parties "can" or "may" amend the SDA "to add rights-of-way, easements, and site payments" for

also assert that the WSEA's good-faith-negotiations requirement must be "read and construed as though it is part of the parties' contract" because the "WSEA was enacted to address the situation in [their] case." Aplee. Br. 32. But as Denbury points out, the WSEA was enacted in 2005 and doesn't apply to the parties' dealings under the SDA, which was executed in 1983. *See* 2005 Wyo. Sess. Laws. Ch. 81 Section 2 ("Any written surface use agreement, consent, prior regulatory approval or judicial order or decree in effect prior to the effective date of this act shall not be subject to the provisions of this act."). Although Section 2's language doesn't appear in Wyo. Stat. Ann. § 30-5-410, the Wyoming Legislature's website explains that it publishes the final version of each bill enacted into law annually in its Session Laws. And its Session Laws are controlling because they "contain the entire enrolled act other than the signatures and certification," including noncodified provisions that "are still part of the law but are not printed in the annotated statutes." *See* http://legisweb.state.wy.us/leginfo/hiswylaw.htm, last visited August 1, 2017.

12

future Unit operations, *id.* at 2450, 2455, and (2) requiring that any such amendments be "*to the* [*parties'*] *mutual satisfaction*," *id.* at 2450 (emphasis added), means that it had no duty to amend the SDA on the Christensens' terms when Denbury didn't agree to those terms.

The Christensens counter that Denbury misframes the issue by focusing on a duty to amend rather than a duty to negotiate in good faith. They argue that because the SDA's provisions contemplate amendments for new wells and roads, the implied covenant obligated Denbury to negotiate in good faith in seeking to amend the SDA. And, the Christensens argue, substantial evidence supports the jury's finding that Denbury breached that duty when it sought to amend the SDA by offering one-time, lump-sum payments—rather than annual payments—for the new Unit operations.

Despite the Christensens' artful attempt to characterize the alleged breach of the implied covenant as one based on Denbury's failure to negotiate in good faith in seeking to amend the SDA, rather than on its failure to amend the SDA, their request for damages belies that characterization.[7] Moreover, their request supports Denbury's argument—an argument the district court acknowledged but ultimately rejected—that the Christensens were essentially "asking the jury to write the contract between the[] parties." App. vol. 7, 1388.

---

[7] In closing arguments, the Christensens asked the jury to "put [them] back into the position they would have been [in] had there been good faith negotiations." App. vol. 7, 1361. And according to the Christensens, that position was the one they would have been in had Denbury agreed to amend the SDA by accepting their counteroffer for surface damages of $2,500/acre initially and annual payments in the same amount. But even good-faith negotiations may not have yielded such an agreement. Thus, the Christensens' request for damages was necessarily premised on Denbury's failure to amend the SDA—not on its failure to negotiate in good faith.

13

Significantly, the Christensens supported their theory that Denbury breached the implied covenant by presenting evidence showing that local surface owners were accustomed to receiving annual payments for surface damages and that Denbury adopted a new policy for surface damage with Unit surface owners that didn't provide for annual payments.[8] But the implied covenant protects contracting parties' rights to receive the "benefit of their agreement," *Scherer*, 18 P.3d at 653, not the benefit of unwritten local customs that purportedly "require" annual payments at the "going rate." And while the scope of the implied obligation also takes into account "the agreed common purpose and justified expectations" of the non-breaching party, *id.*, both the purpose and expectations must be tethered to "the language used" in the agreement and "must be indispensable to effectuate the intention of the parties," *id.* (quoting *Garrett*, 459 N.W.2d at 841).

Under the express terms of the SDA, the Christensens and Cities Service entered into the SDA to replace several existing surface damage agreements with a single agreement. And they agreed that the SDA "addresses only annual payments

---

[8] For example, the Christensens cite Robert Christensen's testimony that Cities Service and the Christensens twice agreed to amend the SDA to add new roads and well sites and both times they agreed to annual payments; that Denbury became the Unit operator in 2012 and continued to make annual payments to the Christensens for existing well sites and roads described in the SDA; and that in 2013 Denbury adopted a new policy that it would no longer pay annual payments to Unit surface owners. The Christensens also point to evidence that Denbury knew its new policy was inconsistent with the terms of the SDA and that Denbury had been told that payment agreements for surface damages "are done differently here in Wyoming." App. vol. 11, 1960. Finally, the jury heard opinion testimony from a professional landman that "annual payments are required in Campbell County, Wyoming" for surface damages, App. vol. 12, 2174, and testimony from a local landowner that the "going rates" for such damages were $2,500 per acre for both annual payments and initial payments, App. vol. 13, 2191.

due" for those rights-of-way, well-sites, and easements described in the SDA. App. vol. 15, 2454. Thus, the purpose of the SDA was to consolidate multiple surface damage agreements for existing Unit operations, and the benefit of the SDA was to ensure that Cities Service would continue to make annual payments for those operations.

As Cities Service's successor, Denbury is bound to honor the terms of the SDA for existing operations covered by the SDA. And, in compliance with its obligations under the SDA, Denbury continues to make annual payments to the Christensens at the rates that the Christensens and Cities Service agreed to in 1983.

But the SDA's provisions permitting amendment upon mutual agreement simply don't support the Christensens' assertion that they harbored justified expectations that for all future Unit operations Denbury would make any offer to amend the SDA—much less that it would ultimately agree to amend the SDA to provide annual payments for surface damages at the purported "going rate" for damages in Campbell County, Wyoming.

As Denbury suggests, had the parties intended to impose specific obligations on Denbury requiring it to offer to amend, or in doing so to offer specific rates or methods of payments for future operations, they could have easily included those obligations in the SDA. *See Whitlock Constr., Inc. v. S. Big Horn Cty. Water Supply Joint Powers Bd.*, 41 P.3d 1261, 1267-68 (Wyo. 2002) (suggesting that if parties intended to impose certain duties, they "were required to expressly state that intention in the contract itself"). But they did not do so. Instead, the SDA unambiguously provides that the parties "can" or "may" amend the SDA to add

15

payments for new operations if they mutually agree to do so. App. vol. 15, 2450, 2455. And *if* Denbury offers to amend to add payments for future operations, the SDA is silent as to the method, type, or amount of any such payments—other than making clear that each party must be satisfied with the amended terms. Thus, the fact that both parties agreed that the SDA could be amended to add new Unit operations didn't bind Denbury to offer or make annual payments for new operations any more than it could bind the Christensens to accept annual payments for new Unit operations at the same rates they agreed to in 1983.[9] Instead, the SDA's amendment provisions merely gave both parties the discretionary option to pursue amendments for future Unit operations, as well as the contractual right not to amend if the parties couldn't mutually agree on the terms. And, as Denbury argues, it merely exercised its contractual right not to amend on the Christensens' terms because it didn't agree to those terms.

---

[9] The dissent primarily asserts that any new roadways and well sites the parties agree to add to the SDA are subject to some automatic annual-payment requirement. *See* Dissent at 7 ("Because roadways and well sites later amended into the SDA are in fact 'constructed' or 'used,' I believe that [the language of the SDA] requires [Denbury] to pay annual payments for those roadways and well sites too."). But even assuming this is the case, the dissent doesn't suggest that the parties ever actually "amended into the SDA," *id.*, the roadways and well sites at issue here. Instead, the dissent makes the curious assertion that the new roadways and well sites were somehow incorporated into the SDA—without any actual amendment—at the precise moment Denbury "beg[an] work on [them]." *Id.* at 10. But not even the Christensens advance this argument. And with good reason: it finds no basis in law or in fact. What's more, the dissent's automatic-incorporation hypothesis is entirely at odds with the Christensens' theory of relief. If the dissent is correct and the new roadways and well sites at issue here were (1) automatically added to the SDA and (2) henceforth subject to some express annual-payment requirement, then the Christensens would have simply sued for breach of the SDA's express annual-payment provision; they would have had no need to invoke the implied duty of good faith and fair dealing.

16

Because Denbury's actions—i.e., making an offer to amend that didn't provide for annual payments and declining to amend when the parties' didn't agree to the terms of the amendment—conformed with the express provisions of the SDA, Denbury was entitled to judgment as a matter of law on the implied-covenant claim. *Scherer*, 18 P.3d at 654 n.2. Consequently, we reverse the denial of Denbury's motions for summary judgment and judgment as a matter of law with respect to the implied-covenant claim. And we remand with directions to vacate the judgment against Denbury on that claim and the corresponding contract damages award.[10] But in doing so, we stress that our holding turns on the very specific language of this particular contract—language that is unambiguously permissive, rather than mandatory.

And notably, this doesn't leave the Christensens without any remedies. In fact, the WSEA provides a remedy for the very situation presented here.[11] *See* Wyo. Stat. Ann. § 30-5-406 (providing surface owner with cause of action for compensation for surface damages "[i]f the oil and gas operator has commenced oil and gas operations in the absence of any agreement for compensation for all damages");[12] *see also* 43

---

[10] Based on our disposition of the implied-covenant claim, we don't address Denbury's arguments that the district court erred (1) in admitting certain evidence relating to the contract damages award and (2) in denying Denbury's motion for remittitur or a new trial based on an excessive contract damages award.

[11] The dissent expresses confusion as to "how the majority applies the WSEA in view of its footnote 6." Dissent at 14. Although the WSEA applies to the parties' *current* dealings, it cannot guide our interpretation of the SDA itself. That's because—as we explain above, *see supra* note 6—the WSEA wasn't enacted until more than two decades after the parties executed that agreement.

[12] The Christensens pursued declaratory judgment claims under the WSEA arising from Denbury's failure to comply with WSEA provisions. Thus, they didn't seek surface and disruption damages as provided by the WSEA. *See* Wyo. Stat. Ann.

U.S.C. § 299(k) (permitting surface owner to seek damages for operator's failure to comply with SHRA provisions); *id.* § 299(l) (permitting surface owner to petition "for payment of all or any portion of a bond or other financial guarantee required under [§ 299(e)] as compensation for any permanent damages to crops and tangible improvements of the surface owner, or any permanent loss of income due to loss or impairment of grazing, or other uses of the land by the surface owner").

But Wyoming law doesn't permit the Christensens to do what they did here—i.e., use the implied covenant of good faith and fair dealing in an existing surface use agreement to impose a new duty that neither arises from the contract language nor is indispensable to effectuate the parties' purpose in entering into that agreement. *See Scherer*, 18 P.3d at 653; *Nationwide Emerging Managers, LLC*, 112 A.3d at 881.

**B**

Next, Denbury argues the district court erroneously dismissed its fifth claim for lack of jurisdiction. In that claim, Denbury sought a declaration that it is entitled to the reasonable use of all of the Christensens' surface land overlying the Unit. The district court concluded the claim didn't present a justiciable controversy under the Declaratory Judgment Act, 28 U.S.C. § 2201, and dismissed it for lack of jurisdiction.

---

§ 30-5-405 (requiring oil and gas operator to compensate surface owner for "loss of production and income, loss of land value and loss of value of improvements," but expressly providing that payments contemplated by this provision "shall only cover land directly affected by oil and gas operations"). Instead, they chose to pursue the more comprehensive compensatory damages available under their breach of contract claim.

18

We review questions regarding justiciability and jurisdiction de novo. *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016); *Awad v. Ziriax*, 670 F.3d 1111, 1119-20 (10th Cir. 2012). In determining whether a court has jurisdiction to grant declaratory relief, the primary question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011) (quoting *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007)). "[E]ven if all the relevant facts regarding a particular legal issue are known or knowable, a court does not have jurisdiction to resolve the issue unless that issue arises in a specific dispute having real-world consequences." *Id.* at 1379.

Here, the district court determined that Denbury's request for a declaration that it is entitled to the reasonable use of all of the Christensens' surface land within the Unit was overly broad. The court reasoned that by the time Denbury moved for summary judgment, the parties' dispute centered on Denbury's right to access Section 3, not its right to access all of the Christensens' land within the Unit.

We acknowledge that the Christensens' counterclaims weren't strictly limited to Denbury's attempt to build the Section 3 road. For example, the Christensens also alleged that Denbury had no right to access Section 14 to drill a new well. And their trespass claim alleged unlawful entry onto Section 14 as well as onto Section 3.

But we agree with the district court's ultimate conclusion. As the district court reasoned, by the time Denbury moved for summary judgment, the Christensens had

19

permitted Denbury access to Section 14, and Denbury had completed work on the Section 14 well. Moreover, the claims the Christensens ultimately presented to the jury focused on whether Denbury complied with the WSEA, as opposed to the SRHA, before entering onto their land to conduct new Unit operations. Specifically, with respect to their declaratory judgment claims, the Christensens asked the jury to decide (1) whether Denbury failed to attempt good-faith negotiations as required by the WSEA, and (2) whether the Section 3 road was reasonable and necessary to oil and gas operations as required under the WSEA.

Granting Denbury's broad request for a declaration that Denbury has a right to the reasonable use of all of the Christensens' surface land within the Unit wouldn't have resolved these disputes. Thus, the "specific dispute having real-world consequences" wasn't whether Denbury has the right to reasonably use the entirety of the Christensens' land within the Unit. *See Columbian Fin. Corp.*, 650 F.3d at 1379. Rather, the specific dispute was whether Denbury complied with the WSEA's preconditions to entry before it exercised that right. For these reasons, we affirm the district court's dismissal of Denbury's fifth claim.

## C

Next, Denbury argues that the district court erred as a matter of law in ruling that the Unit Agreement failed to satisfy the SRHA's written-consent requirement. Denbury asks us to reverse the district court's ruling on this point and conclude that Denbury complied with the SRHA's written-consent requirement.

But we decline to address Denbury's argument. The district court made this ruling in addressing Denbury's motion for summary judgment on Denbury's fourth

claim.[13] In that claim, Denbury sought a declaration that it "is entitled to use all contiguous surface of the Christensen Land that overlies Federal minerals in the Unit." App. vol. 2, 282. Denbury argued, in part, that it was entitled to summary judgment on it fourth claim because the Unit Agreement satisfied Denbury's federal obligation to obtain written consent before entering onto the Christensens' land. *See* 43 U.S.C. § 299(a) (requiring oil and gas operator to provide written notice of its intent to enter onto land and (1) obtain landowner's written consent or waiver, (2) pay for damages to their crops or other tangible improvements, or (3) in lieu of meeting either of these two requirements, post a federal bond); *see also Entek*, 763 F.3d at 1256, n.1 (explaining that unit operator must satisfy SRHA preconditions before entry). But Denbury also suggested that it might be required to, and did, comply with the WSEA's preconditions for entry.[14]

In denying Denbury's motion for summary judgment, the district court first determined that Denbury's fourth claim, like its nonjusticiable fifth claim, was overly broad. The court reasoned, again, that the parties' dispute centered on whether

---

[13] We also note that it's not at all clear what relief Denbury seeks with this argument. After arguing that the district court committed legal error by ruling that the Christensens didn't grant Denbury written consent to enter onto their land by joining the Unit Agreement, Denbury asserts that this error "requir[es] that the District Order be reversed and the judgment against Denbury for trespass be vacated." Aplt. Br. 58. But the Christensens' trespass claim was predicated on Denbury's failure to comply with the WSEA, not the SRHA. Moreover, Denbury expressly stated at oral argument that the trespass damage award was "not at issue" and "hasn't been appealed." Thus, it appears that Denbury is asking us to conclude that the district court committed a legal error that doesn't entitle Denbury to any specific relief.

[14] Denbury specifically stated in its summary judgment motion, "Although it has not been legally decided that Denbury is also required to comply with the [WSEA], Denbury has done so." App. vol. 2, 286. Denbury asserted that it complied by giving the Christensens notice and by posting a bond with the WOGCC.

Denbury had the right to access the Christensens' land to construct the Section 3 road. So, the district court narrowed Denbury's claim to focus on that dispute and then considered whether Denbury had, in fact, complied with both federal law and state law. In addressing Denbury's compliance with federal law, the court concluded that the Unit Agreement didn't satisfy the SRHA's written-consent requirement.

The court then turned to Denbury's compliance with state law. At the outset, the court noted Denbury's acknowledgment that an open question exists as to whether the SRHA preempts the WSEA. But the court further noted that Denbury's counsel expressly stated at oral argument on the summary judgment motion that Denbury "did not want to litigate the issue of preemption." App. vol. 5, 853. And the court ultimately concluded that factual disputes regarding whether Denbury complied with the WSEA's preconditions to entry precluded summary judgment on Denbury's fourth claim.

Denbury's decision below not to argue preemption effectively operated as a concession that it must satisfy preconditions to entry under both the SRHA and the WSEA. That concession, coupled with its failure on appeal to challenge the district court's alternative basis for denying summary judgment on Denbury's fourth claim, i.e., the court's ruling that factual disputes regarding Denbury's compliance with the WSEA precluded summary judgment, makes it unnecessary for us to decide this issue. *See Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 613 n.7 (10th Cir. 2008) ("Indeed, we have gone so far as to hold that where a district court's disposition rests on alternative and adequate grounds, a party who, in challenging that disposition, only argues that one alternative is erroneous necessarily loses because the second

22

alternative stands as an independent and adequate basis, regardless of the correctness of the first alternative.").

Thus, regardless of whether the Unit Agreement satisfied the SRHA's written-consent requirement, and regardless of whether Denbury may have therefore complied with the SRHA, the district court's denial of summary judgment with respect to Denbury's fourth claim stands.

**D**

Finally, Denbury argues that the district court abused its discretion in denying Denbury's motion to stay the trial to allow the BLM to exercise primary jurisdiction and decide whether the Section 3 road is reasonable and necessary to Unit operations. Denbury argues that the BLM regulates nearly every aspect of onshore operations overlying federal oil and gas leases and is in the best position to determine whether the Section 3 road is reasonable and necessary to Unit operations.

We review a district court's decision denying a stay under the primary jurisdiction doctrine for abuse of discretion. *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir. 2005). And we find no abuse of discretion here. The doctrine of primary jurisdiction ordinarily applies in cases "involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996) (quoting *Nat'l Commc'ns Ass'n, Inc. v. AT&T*, 46 F.3d 220, 223 (2d Cir. 1995)). We agree with the district court that the question of "whether a dirt road connecting two existing dirt roads is reasonable and necessary" is not that kind of

question. App. vol. 6, 1031. Thus, we affirm the district court's denial of the motion to stay the trial.

*     *     *

We reverse the district court's denial of Denbury's motion for summary judgment on the implied-covenant claim and remand with directions to vacate the judgment against Denbury as to that claim and the $1,751,991.00 contract damages award. We affirm the remainder of the judgment and the trespass award, the court's order denying the motion to stay the trial, and the court's order dismissing Denbury's fifth claim for lack of jurisdiction.

Entered for the Court

Nancy L. Moritz
Circuit Judge

24

15-8106, *Denbury Onshore v. Christensen, et al.*

**PHILLIPS**, Circuit Judge, concurring and dissenting

I concur in the majority's opinion, except for its conclusion that Denbury is entitled to a judgment as a matter of law on the Christensens' claim for breach of the implied covenant of good faith and fair dealing. I join in the majority's recitation of the underlying facts and procedural history.

This case is the tale of a longtime Wyoming ranch family, the Christensens, and its experiences with two different unit operators over the past 34 years. All went well for the first 30 years. The unit operator during that time, Cities Service, was a good neighbor, entering a Surface Damage Agreement (SDA) with the Christensens in 1983, and paying agreed-upon sums annually for damages caused by its oil and gas operations on their land. Things took a dramatic turn for the worse in 2013, when Denbury became the unit operator. Where before, all had been good-faith negotiations and fair treatment, Denbury arrived with a different mindset. No longer would both sides sit down to set a price for damages done—no, under Denbury's new policy it could run roughshod, offering the Christensens a relatively meager, take-it-or-leave-it damages payment, despite estimating that the impact would last for 30 years, and all while not even bothering to consider the SDA in formulating its new policy.

The majority opinion does a good job setting out the procedural history of this case and the parties' claims in the district court and on appeal. The primary issue before us concerns the more-than $1.7 million dollar verdict in favor of the Christensens on their claim that Denbury breached the implied covenant of good faith and fair dealing, which

in Wyoming attaches to all commercial contracts, including the SDA between Cities Service and the Christensens (and binding their successors, including Denbury).

In its thorough order denying summary judgment to Denbury on the Christensens' implied-covenant claim, the district court set out the Wyoming law governing that claim. Under this law, the district court concluded that the question whether a party has breached the implied covenant of good faith and fair dealing "is ordinarily one of fact, focusing on the conduct alleged as constituting the breach within the context of the contract language, the parties' course of conduct and industry standards." Appellant App. vol. 5 at 863 (citing *City of Gillette v. Hladky Constr., Inc.*, 196 P.3d 184, 196-97 (Wyo. 2008)). The court also noted that "[a] party is entitled to judgment as a matter of law on the claim [for breach of the implied covenant of good faith and fair dealing] only where the actions alleged to have breached the covenant were in conformity with the clear contract language." *Id*. After considering the parties' competing arguments, the court concluded "that the evidence establishes a material dispute as to whether Denbury's alleged conduct 'went beyond the exercise of contract rights and amounted to self-dealing or a violation of community standards of decency, fairness or reasonableness.'" *Id*. (citing *Hladky*, 196 P.3d at 197). The court found the factual dispute genuine "because a reasonable juror could resolve the question in favor of either side." *Id*.

After a weeklong jury trial, the jury returned a verdict in favor of the Christensens. In its Judgment in a Civil Case, the court reviewed the jury's findings, two of which were (1) that "Denbury Onshore, LLC failed to negotiate in good faith in attempting to reach a surface use agreement prior to entry on Robert F. Christensen and Janet K. Christensen's

2

surface estate for conducting operations as required by the Wyoming Split Estate Act[.][1]; and (2) that "Denbury Onshore, LLC, breached the implied covenant of good faith and fair dealing in its dealings with Robert F. Christensen and Janet K. Christensen under the Surface Damage Agreement[.]"[2] Appellant's App. vol. 7 at 1377–78. For the implied-covenant claim, the jury made three specific findings: (1) that Denbury had breached the implied covenant of good faith and fair dealing under the SDA in its dealings with the Christensens; (2) that Denbury's breach had caused the Christensens damage; and (3) that the amount of money to reasonably compensate for the breach was $1,751,991. *Id*. at 1379.

Soon after trial, Denbury filed a motion under Rule 50(b) of the Federal Rules of Civil Procedure. Under this rule, the district court reviewed whether a reasonable jury could return the same verdict based on legally sufficient evidence. In evaluating that question, the district court noted that it must draw all reasonable inferences in favor of the Christensens. The court then turned to Denbury's argument for relief—the same one now on appeal, namely, that it had no duty to amend the SDA when it was unsatisfied with a proposed amendment. In opposition, the Christensens argued that the jury's verdict was sound, based on the common purpose of the SDA and on their justified expectations, and that Denbury had deprived them of the benefit of their bargain.

---

[1] The jury's finding that Denbury had not attempted good-faith negotiations as required by the WSEA helps inform the jury's finding that Denbury breached the implied covenant of good faith and fair dealing.

[2] In addition, the jury found that Denbury's proposed connecting road was not reasonable and necessary to the conduct of oil and gas operations under the WSEA, and that Denbury has trespassed on the Christensens' land.

3

After considering the arguments, the district court concluded that "[d]uring the trial, the jury heard evidence that Denbury's actions were not in conformity with the language of the SDA." Appellant's App. vol. 9 at 1703. The court determined that the jury had a legally sufficient evidentiary basis to find that Denbury had breached the implied covenant of good faith and fair dealing. The court summarized some of the supporting evidence, specifically referring to the testimony of Denbury employee, Vern Johnson, who had told Denbury that its new damages policy was not in accordance with the historical and expected payments customary in the region; to Denbury's new policy having disregarded the SDA's provisions on conditions to the unit operator's seeking easements or rights of way on the land;[3] to Denbury's offering to pay a one-time, lump-sum damage payment rather than the annual damages found in the SDA; and to Denbury's paying other landowners in the region annual damages.

At trial, the district court instructed the jury on Wyoming law governing the implied covenant of good faith and fair dealing. Included in this was direction to consider the contract language (in the SDA), the course of conduct of the parties, and industry

---

[3] In 1980, the Wyoming Oil and Gas Commission approved the Hartzog Draw Unit, and the Christensens signed the Unit Agreement that year. In 1983, the Christensens and Cities Service (Denbury's predecessor as Unit Operator from 1983 to 2013) entered into the Surface Damages Agreement. In paragraphs 3 and 4 of the SDA, the Christensens granted right-of-way easements to Cities Service's employees to enter their property "for the purpose of conducting production operations of the below described wells and facilities under lease or leases." Appellant's App. vol. 15 at 2449. But upon becoming unit operator, Denbury declared in its new policy that it would no longer seek easements or rights of way from the Christensens, saying that the Unit Agreement already gave it that right.

4

standards. In examining the SDA, I look to see whether Denbury is correct that its actions conformed to clear contract language, entitling it to judgment as a matter of law.

As the majority recounts, Cities Service and the Christensens signed the SDA in 1983, three years after the Wyoming Oil and Gas Commission established the Hartzog Draw Unit. With unitization came some restructuring of earlier agreements. For instance, Paragraph 18 of the SDA lists 69 well-site agreements "to be superseded, cancelled and replaced[.]" Appellant's App. vol. 15 at 2454–55. Paragraph 19 lists multiple "roads, well sites, and battery sites" made a part of the agreement, referring to the listings in Exhibits "A" and "B". *Id*. at 2455. So consolidating the scattered agreements was obviously one purpose of the SDA. But I believe that the majority goes too far in asserting that "*the* purpose of the SDA was to consolidate multiple surface damage agreements for existing Unit operations, and *the* benefit of the SDA was to ensure that Cities Service would continue to make annual payments for those operations."[4] Maj. op. at 15 (emphasis added).

To understand why, we need to read the SDA as a whole. Under the SDA, the roadways and well sites listed in Exhibits "A" and "B" are not static. As Paragraph 19 says, "Exhibits 'A' and 'B' may be amended by adding to or, deleting roads or sites covered under their Agreement by written approval of both the Owners and Operator."

---

[4] In this regard, the majority declares that "[u]nder the express terms of the SDA, the Christensens and Cities Service entered into the SDA to replace several existing surface damage agreements with a single agreement. And they agreed that the SDA 'addresses only annual payments due' for those rights-of-way, well-sites, and easements described in the SDA." *Id*. at 14-15 (quoting Appellant's App. vol. 15, 2454).

5

Appellant's App. vol. 15 at 2455. Because understanding Exhibits "A" and "B" is key to understanding the SDA, I turn to them.

Under Exhibit "A", paragraph A, the SDA lists 78 "roadways covered by this Agreement." *Id*. at 2459. It identifies the HDU well names (e.g., #5182), the former operators' names, the trunk roads (107,872 rods before September 1, 1980, and 14,872 rods after that until September 1, 1983), and the branch roads (rods) (34,768 rods before September 1, 1980, and 2,140 after that until September 1, 1983)." *Id*. at 2459–60. Paragraph B provides that "[t]he annual payments to be paid Owner by Operator for rights-of-way and easements as to roadways are as follows:" and lists annual dollar figures for all 78 roads. *Id*. at 2460–62.

Under Exhibit "B", the SDA lists 80 well and battery sites, each with a specific annual payment. Then for the "Exhibit A-1 Ammendment [sic]," dated September 1, 1983, and signed by the Christensens on December 5, 1985, the SDA lists 46 additional roadways, again all with associated annual payments. *Id*. at 2465–67. What stands out is that for every single one of the 204 listed well sites and roadways, Cities Service agreed to pay annual payments.

This takes us back to Denbury's offers to the Christensens. For the well sites and the connector road, Denbury sought to amend the SDA to include its new well sites and new connector road under Exhibits "A" and "B".[5] And under SDA paragraph 19, those

---

[5] The November 6, 2013 letter from Denbury to the Christensens concerned "HDU-5144H Well" and gave notice of Denbury's planned entry under paragraph 8 of the SDA. Appellant's App. vol. 15 at 2473. The November 27, 2013 letter from Denbury

proposed amendments "shall be a part of this agreement *in all respects*." Appellant's App. vol. 15 at 2455. As I read it, this means that the SDA's terms also govern newly added roadways and well sites to Exhibits "A" and "B" just as they govern the roadways and well sites originally listed in the two exhibits. On this point, one important part of the SDA is found at paragraph 9:

> For all roads constructed or used under or across the lands of Owners in connection with Operator's drilling, production or other rights hereunder, for the described wells, Operator agrees to pay annual payments in advance as described in Exhibit "A" of this Agreement for each successive or additional year Operator shall be engaged in or using the same. The annual payment shall allow Operator rights-of-way and easements to be used by Operator, its agents, servants, employees and successors in interest as long as the annual payments are made and the described wells and its incident leases are in production and valid.

*Id*. at 2450–51. Because roadways and well sites later amended into the SDA are in fact "constructed" or "used," I believe that this language requires the Operator to pay annual payments for those roadways and well sites too. We know that Denbury offered no such thing. Thus, the jury was justified in its finding that Denbury didn't attempt good faith negotiations and that it breached the implied covenant of good faith and fair dealing.

But Denbury sidesteps any such analysis by arguing that it could not breach the implied covenant when it had no duty to reach an agreement with the Christensens under the SDA. As I understand it, Denbury contends that the SDA is optional—a mere permissive, first-try method of reaching agreement for surface damages caused by oil and gas operations. And that it is even free to disregard the SDA and not make an offer under

---

to the Christensens about the connector road referenced the SDA and also gave notice of paragraph 8 of the SDA.

it, or to make a take-it-or-leave it offer and disregard the SDA after the offer is refused.

In support of this power, undiscovered by Cities Service apparently, Denbury relies

primarily on two paragraphs of the SDA:

> 7. It is agreed that this Agreement can be ammended [sic] so as to add rights-of-way, easements, and site payments by the revision of Exhibit "A" and Exhibit "B" to the mutual satisfaction of Owners and Operator.
>
> …
>
> 19. Exhibits "A" and "B" attached hereto describing said roads, well sites, and battery sites are made a part of this Agreement. Exhibits "A" and "B" may be amended by adding to or deleting roads or sites covered under their Agreement by written approval of both the Owners and Operator. Such amendments to Exhibits "A" and "B" shall be a part of this agreement in all respects.

Appellant's App. vol. 15 at 2450, 2455.

Denbury stresses the permissive "can" and "may."

The majority agrees with Denbury's reading, saying that "[i]nstead, the SDA's

amendment provisions merely gave both parties the discretionary option to pursue

amendments for future Unit operations, as well as the contractual right not to amend if

the parties couldn't mutually agree on the terms." Maj. op. at 16. From this, the majority

asserts that Denbury "conformed with the express provisions of the SDA" by its

actions—"making an offer to amend that didn't provide for annual payments and

declining to amend when the parties didn't agree to the terms of the amendment[.]" *Id.* at

17. Thus, the majority overturns the jury's verdict by relying on "the very specific

language of this particular contract—language that is unambiguously permissive, rather

than mandatory." *Id.*

8

I agree that the Christensens cannot force Denbury to amend the SDA. But I don't agree that Denbury can proceed with the roadway and well sites without negotiating in good faith for surface damages under the SDA. Otherwise stated, I see nothing in the SDA allowing Denbury to unilaterally disregard the SDA, or to allow Denbury to demand terms contrary to the SDA, when seeking and beginning new roadways or well sites that will cause surface damages. If future damages under the SDA are undeserved in a given situation, the parties are free to agree to a more limited agreement for that situation. But the jury was within its rights to find that Denbury had not negotiated in good faith with the Christensens by making its meager take-it-or-leave-it offer and then abandoning any attempt to negotiate under the SDA.

The majority's view (and Denbury's) is that the SDA permits Denbury to offer a one-time damage award not even based on actual damages over 30 years—all as an amendment to Exhibit "A" and "B" of the SDA. As mentioned, the two SDA exhibits provide annual damages for all 80 well and battery sites, and for all 124 roadways (46 of which were later amended into the SDA). For me, that hardly established a clear contract right to insist on non-annual damages payments. In fact, as discussed with paragraph 9 above, it is reasonable to conclude that good-faith negotiations under the SDA would result in payment of annual damages.[6] And in my view other language in the SDA

---

[6] The Christensens assert that "[t]he SDA language unambiguously states that the parties to the agreement *agreed to annual payments*." Appellee's Br. at 20 (emphasis in original). And they also point out that "[t]he jury also correctly found that Denbury breached its implied covenant when it unilaterally refused to pay any annual surface damage payments for the new wells and associated roads located on the Christensens' property." *Id*. at 12.

supports that position. For instance, take a look at neighboring paragraphs to Denbury's oft-cited paragraph 7:

> 5. Roadways covered by this Agreement and annual payments relative to these roadways, rights-of-way, and easements are agreed to be as shown in Exhibit "A" of this Agreement.
>
> 6. Well sites and tank battery sites covered by this Agreement and annual payments relative to said sites are agreed to be as shown in Exhibit "B" of this Agreement.

*Id*. at 2450. I believe that once Denbury begins work on a road or new well sites, the road and well sites are "covered by this agreement." They are the very things giving rise to the SDA. And because they are covered—absent a separate agreement by the parties—Denbury must honor the implied covenant of good faith and fair dealing under the SDA and undertake good-faith negotiations. Then paragraph 9 requires annual payments. Even if one disagrees on any or all of these steps, hasn't Denbury failed to show that its actions are within the clear language of the SDA? I'd say yes.

As for paragraphs 7 and 19, I see them as fitting nicely into the whole SDA scheme—advising how to add new well sites and roadways to Exhibits "A" and "B" of the SDA. Cities Service and the Christensens had done exactly that. Obviously, before the parties could add any new roadways or well sites to the SDA's exhibits, the parties would need once again to agree on some terms, for example, the size of the well and battery sites, the length of the roads, and the amount of annual payments necessary to account for the annual damages from oil and gas operations.

So I disagree with the majority that the jury somehow was barred from finding that Denbury had no unilateral powers inside or outside the SDA to dictate historically

10

unreasonable terms as part of supposedly trying to amend Exhibits "A" and "B". I believe that the jury acted well within the court's instruction directing it to determine the "purpose, intentions, and expectations of the parties" by "considering the contract language, the parties' course of conduct, and industry standards." Here is Instruction 35 on this subject:

> Every contract includes an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. The purpose, intentions, and expectations of the parties should be determined by considering the contract language, the parties' course of conduct and industry standards.
>
> The implied covenant of good faith and fair dealing may not be used to create new, independent rights or duties beyond those agreed to by the parties. The concept of good faith and fair dealing is not a limitless one. Rather, it must arise from the language used or be indispensable to effectuate the intention of the parties as determined by the contract language, the parties' conduct and their course of dealing. In the absence of evidence of self-dealing or breach of community standards of decency, fairness and reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

Appellant's App. vol. 6 at 1095; vol. 14 at 2347.

I disagree with the majority that the jury "use[d] the implied covenant of good faith and fair dealing in an existing surface use agreement to impose a new duty that neither arises from the contract language nor is indispensable to effectuate the parties purpose in entering into that agreement." Maj. op. at 18 (citations omitted). As for the purpose of the agreement and the parties' intentions, we need look no further than the 30-

11

year history between Cities Service and the Christensens. Never did Cities Service claim the unilateral powers that Denbury claims. Instead, it amended the SDA under Exhibits "A" and "B" and paid the landowners damages caused by the oil and gas operations.

The district court did not abuse its discretion in allowing evidence on all those subjects. As samplers from what the jury heard, I just highlight a few. The jury heard testimony that Denbury's newly established damages policy was based on a report by its employee, Dennis Pathroff. Based on the evidence, the jury could believe that Mr. Pathroff lacked sufficient experience or training even to know what a good-faith offer to the Christensens would involve. The jury heard Mr. Pathroff testify about his lack of experience appraising land, including pasture land; about his being untrained in measuring the impact of oil and gas operations on it; about his not having contacted the Christensens or other landowners in the HDU; about his not having visited the HDU; and about his not having been informed of the SDA or reviewed it before preparing his report.

In addition, the jury heard testimony from Paul Hayden, Denbury's regional land manager, that the new policy was intended to compensate landowners only for the dirt disturbances on their property. Mr. Hayden acknowledged that the new policy did not account for Denbury's continued use of the land surface by truck traffic and other activities. And importantly, Mr. Hayden testified that he did not consider the SDA in formulating Denbury's damages policy, because he felt Denbury was not compelled to "amend or comply with, with any of the provisions as it relates to future operations, future proposed operations." Appellant's App. vol. 13 at 2244–45.

12

I would also affirm the jury's verdict on damages. The jury acted in accordance with the law given in the jury instruction:

> If you find that Denbury breached the covenant of good faith and fair dealing then the non-breaching party is permitted to recover those reasonably foreseeable damages that directly resulted from the breach. The non-breaching party is entitled to recover such an amount as would place it in the condition it would have been if the other party had not breached the covenant, less that which was saved by the non-breaching party.

Appellant's App. vol. 6 at 1096. Here, the jury had a substantial evidentiary basis to include the amounts it did to place the Christensens in the condition they would have been absent Denbury's breach. Had Denbury chosen not to pursue the well sites and connecting road after its "offer" was refused, the Christensens would not face 30 years of damages caused by Denbury's increased oil and gas operations on their land. The jury applied the evidence to the law. It weighed the evidence, assessed the conduct of the parties, considered the SDA, and followed the jury instructions. It found the facts, one of which, the law instructs, is whether Denbury breached the implied covenant of good faith and fair dealing.

The majority says that it has not left the Christensens without remedy. It cites Wyo. Stat. Ann. § 30-5-406 of the Wyoming Split Estate Act (WSEA) as "providing [a] surface owner with [a] cause of action for compensation for surface damages '[i]f the oil and gas operator has commenced oil and gas operations in the absence of any agreement for compensation for all damages." Maj. Op. at 17. First, I dispute that Denbury commenced operations without a damages agreement. The SDA qualifies as such. Second, this Wyoming statute speaks more to single episodes of damage rather than

13

recurring damages over months and years. And third, I am uncertain how the majority applies the WSEA in view of its footnote 6. There, the majority declares that the WSEA "doesn't apply to the parties' dealings under the SDA[.]" Maj. op. at 12 n.6.

For all these reasons, I would affirm the jury's verdict.